# EXHIBIT 1

# Summons & Amended Complaint and Acceptance of Service

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | FIFTEENTH JUDICIAL CIRCUIT |
| COUNTY OF HORRY | ) | CIVIL ACTION NO. 2013-CP-26-05277 |
| | ) | |
| Steven deMoraes | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **SUMMONS** |
| Marriott International, Inc., Aetna Life | ) | |
| Insurance Company, and Marriott | ) | |
| International, Inc. Benefit Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TO:    THE ABOVE-NAMED DEFENDANTS**

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, of which a copy is herewith served upon you, and to serve a copy of your answer to the said Complaint on the subscribers at their office at 1000 29th Avenue North, Myrtle Beach, South Carolina 29577, and to file your answer with the Clerk of Court for Horry County, all within thirty (30) days after the service hereof, exclusive of the day of such service; and if you fail to answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court for judgment by default for the relief demanded in the Complaint and a judgment will be rendered against you.

BELLAMY, RUTENBERG, COPELAND, EPPS,
GRAVELY & BOWERS, P.A.
Post Office Box 357
Myrtle Beach, South Carolina 29578-0357
843-448-2400
Attorneys for the Plaintiff

_____
Benjamin A. Baroody, SC Bar #7253?

Myrtle Beach, South Carolina

August 2 7 , 2013

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | FIFTEENTH JUDICIAL CIRCUIT |
| COUNTY OF HORRY | ) | CIVIL ACTION NO. 2013-CP-26-05277 |
| | ) | |
| Steven deMoraes | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | ERISA |
| Marriott International, Inc., Aetna Life | ) | (Non-Jury) |
| Insurance Company, and Marriott | ) | |
| International, Inc. Benefit Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TO:   THE ABOVE-NAMED DEFENDANTS**

COMES NOW Steven deMoraes who, complaining of the above-captioned Defendants, respectfully alleges the following:

1.     Plaintiff Steven deMoraes is a citizen and resident of Horry County, State of South Carolina.

2.     Defendant Marriott International, Inc. (hereinafter "Marriott") is a foreign corporation organized and existing under the laws of the State of Delaware which does business in the State of South Carolina, including Horry County, through various hotel and timeshare resort operations including the Marriott OceanWatch Villas located in Myrtle Beach, South Carolina. Marriott International, Inc., through its Corporate Benefits Department, serves as the Plan Administrator of a Group Benefits Plan underwritten by Aetna Life Insurance Company.

3.     Defendant Aetna Life Insurance Company ("Aetna") is, upon information and belief, a foreign corporation organized and existing under the laws of the State of Connecticut, which

does business in the State of South Carolina. Aetna prepared and issued the Benefit Plan that is the subject of this lawsuit to Marriott for the purpose of providing certain employment benefits to Marriott's employees, including Plaintiff.

4.    The Marriott International, Inc. Benefit Plan, underwritten by Aetna (hereinafter "the Plan") is the Benefit Plan that is the subject of this lawsuit and a party hereto pursuant to 29 U.S.C. Section 1132. A complete, true, and accurate copy of the Plan is attached hereto as EXHIBIT A and incorporated herein by reference.

5.    The jurisdiction of this Honorable Court arises under the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. § 1001, *et. seq.*

6.    deMoraes became employed by Marriott at its OceanWatch Villas Resort in Myrtle Beach, South Carolina in March of 2004 as a timeshare Sales Executive.

7.    During his employment with Marriott, deMoraes was a participant in the Plan, which provided deMoraes with various employment benefits, including short and long-term disability coverage. deMoraes was, therefore, entitled to apply for and receive short term and long term disability benefits pursuant to the terms of the Plan.

8.    On February 27, 2010, while recovering from spinal surgery, deMoraes suffered a disabling stroke, which resulted in memory loss, severe headaches, neck pain, vertigo, dizziness, difficulty retaining information, and difficulty focusing.

9.    The aforementioned symptoms caused deMoraes to become unable to return to work and to seek medical treatment from a neurologist, under whose care deMoraes remains to-date.

10.    deMoraes had already been approved for short-term disability since the back surgery was going to keep him out of work for three (3) months (the "First Short Term Claim"). Upon having the stroke the short-term disability coverage was extended.

11.    Pursuant to the terms of the Plan, Defendants correctly calculated deMoraes' short-term disability benefits at sixty percent (60%) of his pre-disability earnings from the period of February 1, 2009 until February 1, 2010. Defendants correctly calculated deMoraes' pre-disability earnings as $236,531.48, which figure included earned sales commissions but excluded earned bonuses during the same period, including without limitation $40,000.00 performance bonus received in December of 2009.

12.    On July 6, 2010, deMoraes attempted to return to work against the recommendation of his neurologist and in spite of the persistence of his disabling condition. deMoraes remained employed in a limited capacity until May 4, 2011, when the aforementioned disabling symptoms proved too difficult for deMoraes to bear and work. deMoraes' gross earnings for the balance of 2010 were a mere $67,0652.60. deMoraes' gross earnings for 2011 were a mere $22,994.83. During this period of re-employment, deMoraes remained under the care of his neurologist and earned far less than eighty percent (80%) of his gross pre-disability earnings of $236,531.48 ($283,630.82, less bonuses).

13.    In June of 2011, deMoraes again applied for short-term disability benefits based upon the same symptoms resulting from his stroke, which application was denied by Defendants ("the Second Short-Term Claim").

14.    On July 26, 2011, deMoraes appealed Defendants' denial of deMoraes' Second Short-Term Claim and applied for long-term disability benefits based upon the same symptoms resulting

from his stroke. A copy is attached hereto as EXHIBIT B and incorporated herein by reference.

15.   deMoraes' disabling symptoms were the direct and proximate result of his stroke and no subsequent event, as is confirmed by his neurologist and the independent neuropsychologist who deMoraes saw at the request of Defendants.  deMoraes' disabling symptoms did not change or vary from the date of his stroke to the date of his applications and approvals for short term disability benefits, to his application for long-term disability benefits.

16.   According to deMoraes' disability earnings statement dated October 2, 2010, which deMoraes received from Defendants, Defendants acknowledged that, in the event deMoraes were to be approved for short or long-term disability benefits in 2011, deMoraes' pre-disability earnings would be calculated at $236,521.48.

17.   In September of 2011, Defendants reversed their initial denial of deMoraes' Second Short-Term Claim and again granted deMoraes short-term disability benefits  based upon pre-disability earnings of $236,531.48 ($283,630.82, less bonuses) from the period of February 1, 2009 - February 1, 2010, the same amount Defendants had approved for deMoraes' First Short-Term Claim in May of 2010.

18.   On February 17, 2012, Defendants approved deMoraes' claim for long-term benefits. However, Defendants erroneously calculated his long term benefit payment as sixty-percent (60%) of his July 2010- May 2011 earnings of $69,453.55 instead of sixty-percent (60%) of his February 1, 2009 - February 1, 2010 pre-disability/pre-stroke earnings of $283,630.82. A copy of Aetna's approval notification is attached hereto as EXHIBIT C and incorporated herein by reference.

19.    On March 14, 2012, deMoraes appealed Aetna's calculation of long-term benefits. A copy
is attached hereto as EXHIBIT D and incorporated herein by reference.

20.    In June of 2012, deMoraes applied for and was approved for Social Security Disability
benefits through the United States Social Security Administration.

21.    On July 17, 2012, while deMoraes' appeal was pending, Aetna informed deMoraes that it
was terminating his long term disability benefits after concluding deMoraes was no longer
disabled. A copy is attached hereto as EXHIBIT E and incorporated herein by reference.

22.    On December 28, 2012, Plaintiff appealed Aetna's termination of long-term disability
benefits to the Claims Administrator. In his appeal, deMoraes contended 1) that Aetna had
wrongfully terminated his disability benefits because he, in fact, met the Plan's definition of
disability, and 2) that, if approved, his benefits should be calculated at sixty percent (60%)
of his pre-disability/ pre-stroke earnings from February 1, 2009 - February 1, 2010, as had
been done by Defendants in their approval of his First and Second Short-Term Claims. A
copy of is attached hereto as EXHIBIT F and incorporated herein by reference.

23.    On April 19, 2013, the Claims Administrator reversed Aetna's denial of deMoraes' claim for
long term benefits, finding that he met the Plan's definition of disability. However, the
Claims Administrator again miscalculated the benefit payment at sixty percent (60%) of
deMoraes' earnings from July 2010 until June 2011 and provided no basis for that
calculation. A copy is attached hereto as EXHIBIT G and incorporated herein by reference.

24.    On May 3, 2013, deMoraes wrote the Claims Administrator to request a basis for the
calculation. A copy is attached hereto as EXHIBIT H and incorporated herein by reference.

25.    On July 3, 2013, Aetna wrote deMoraes setting forth a detailed basis for its calculation of deMoraes' long-term benefits. A copy is attached hereto as EXHIBIT I and incorporated herein by reference.

26.    deMoraes has now exhausted his administrative remedies and brings this action to reverse Aetna's erroneous, arbitrary, and capricious calculation of long-term benefits pursuant to 29 U.S.C. Section 1132(a).

27.    Specifically, the Defendants have misconstrued the plain and unambiguous language of the Plan, which has led to an erroneous calculation of long-term disability benefits to which deMoraes is entitled.

28.    deMoraes met the Plan's test of disability as early as February 9, 2009, when he underwent back surgery, and as late as February 27, 2009, the day of his stroke.

29.    deMoraes has continuously met the Plan's test of disability since that date, without interruption.

30.    Thus, deMoraes' pre-disability earnings must be calculated as the twelve months preceding the date he met the Plan's test of disability.

31.    deMoraes' pre-disability earnings total $283,630.82.

32.    Based upon the Plan's calculation of benefits, deMoraes is entitled to payment of long-term disability benefits calculated at sixty percent (60%) of $283,632.82 or $170,178.49 on an annual basis from the time his Second Short Term benefits ran out in or around November of 2011, for so long as deMoraes remains eligible to recover benefits pursuant to the Plan. A calculation of benefits owing as of August 1, 2013 is attached hereto as EXHIBIT J and incorporated herein by reference.

33. Defendants are obligated to continue paying Plaintiff the monthly benefits sought herein so long as Plaintiff's current disability condition continues until August 8, 2019, when deMoraes reaches the age of 65.

34. Plaintiff requests pre-judgment interest in an amount to be determined by this Court.

35. Pursuant to 29 U.S.C. § 1132(g), Plaintiff requests attorney's fees in an amount to be determined by this Court.

WHEREFORE, Plaintiff demands judgment against the Defendants for the relief provided in 29 U.S.C. § 1132(a), for attorney's fees, pre-judgment interest and for such other and further relief as this Court may deem just and proper.


Respectfully submitted,

BELLAMY, RUTENBERG, COPELAND, EPPS,
GRAVELY & BOWERS, P.A.
Post Office Box 357
Myrtle Beach, South Carolina 29578-0357
843-448-2400
Attorneys for the Plaintiff


Benjamin A. Baroody, SC Bar #72533


Myrtle Beach, South Carolina

August ___, 2013

## VERIFICATION

PERSONALLY appeared before, Steven deMoraes, and says that he has read the foregoing

Complaint and that the information contained therein is true.

_____
Steven deMoraes

Sworn to and subscribed before

me this __1__ day of __August__, 2013

_____
Notary Public for South Carolina
My Commission Expires: __10|10|2016__

*a rewarding* Experience

· my PAY & BENEFITS ·

Your Benefits Program

# Long-Term
# Disability (LTD) Plan

Summary Plan Description



Marriott

EXHIBIT A

# TABLE OF CONTENTS

BENEFITS AT A GLANCE ........................................................................................................ 2

ELIGIBILITY ........................................................................................................................... 4
    Eligible employees ............................................................................................................ 4
    Eligible International Employees ........................................................................................ 4
    Waiting Period ................................................................................................................... 4
    Ineligible Individuals ......................................................................................................... 4

ENROLLMENT ....................................................................................................................... 5
    How to Enroll .................................................................................................................... 5
    When Coverage Takes Effect ............................................................................................ 5
        Newly Hired Employees ............................................................................................... 5
        Newly Eligible Employees ............................................................................................ 5
        Annual Enrollment ...................................................................................................... 5
        Employees Absent From Work When Coverage Is Scheduled to Begin ............................ 6
    Late Enrollees ................................................................................................................... 6

YOUR LTD PLAN CONTRIBUTIONS ....................................................................................... 7
    Contributions From Participants While on a Leave of Absence or Receiving Disability Payments ....... 7
        If You Are Off Work Due to a Covered Disability ........................................................... 7
    Paying For Benefits When Paychecks Do Not Cover Plan Contributions ............................... 8
        Payment Process ......................................................................................................... 8
        How to Submit Payment .............................................................................................. 8
        Cancellation of Benefits Coverage ................................................................................. 9
    Reinstating Coverage Following an FMLA or Military Leave of Absence ................................ 10
    Withdrawing From the Plan ............................................................................................... 10

LTD PLAN PROVISIONS ......................................................................................................... 11
    How the Plan Works ......................................................................................................... 11
        Disability/Disabled Defined ......................................................................................... 11
        182-Day Elimination Period ........................................................................................ 11
        Recurrent Periods of Disability .................................................................................... 12
        Pre-Existing Condition Limitations ............................................................................... 12
        Disabilities That Have a Limited Pay Period ................................................................. 12
        When Payments Will Stop ........................................................................................... 13
        Maximum Period of Payment ...................................................................................... 14
        Amount of Disability Benefits ...................................................................................... 14
        Total Benefit Cap ....................................................................................................... 14
        Fluctuation in Disability Earnings ............................................................................... 14
        Deductible Sources of Income ..................................................................................... 15
        Non-Deductible Sources of Income .............................................................................. 16
    Applying for Other Sources of Income .............................................................................. 16
    Social Security Benefits .................................................................................................... 16
    Survivor Benefit .............................................................................................................. 17
    Work Incentive Benefit .................................................................................................... 17
    Rehabilitation and Return-to-Work Assistance Program ..................................................... 19
        Additional Benefits Aetna Will Pay While You Participate in a Rehabilitation and Return-to-Work
        Assistance Program .................................................................................................... 19

WHAT IS NOT COVERED ....................................................................................................... 20

EVENTS THAT MAY AFFECT PLAN COVERAGE ...................................................................... 21
    When Coverage Ends ....................................................................................................... 21

January 2010

EXHIBIT A

Termination of Employment ................................................................. 21
Leave of Absence ............................................................................. 21
Failure to Pay Contributions ............................................................. 22
Request to Cancel ............................................................................ 22
Ineligibility to Participate ................................................................. 22
Death ............................................................................................... 22
Labor Dispute .................................................................................. 22
Fraudulent Act/Severe Misconduct .................................................. 23
Termination of the Plan ................................................................... 23

HOW TO FILE A CLAIM .................................................................... 24
If You Do Not Participate in the Salaried Short-Term Disability Plan .. 24
If You Also Participate in the Salaried Short-Term Disability Plan ...... 24
To Report a Claim ............................................................................ 24
Information Needed as Proof of Your Claim .................................. 25
Claim Processing ........................................................................... 25
If Your Claim Is Denied ................................................................. 25
Legal Proceedings ........................................................................... 26
Recovery of Overpayments .............................................................. 26

YOUR APPEAL RIGHTS .................................................................... 27
Eligibility/Participation Appeals ....................................................... 27
Level I Eligibility/Participation Appeal .......................................... 27
Level II Eligibility/Participation Final Appeal ................................ 28
Benefit Claims Appeals ..................................................................... 29
How to Submit a Benefit Claims Appeal ....................................... 29
Determination of Appeal ............................................................... 29

IMPORTANT PLAN DEFINITIONS ..................................................... 30

IMPORTANT ADDRESSES AND PHONE NUMBERS ......................... 34
Insurance Company .......................................................................... 34
Plan Administrator ........................................................................... 34

YOUR RIGHTS .................................................................................. 35
Plan Administration .......................................................................... 35
Rights of Participants ....................................................................... 38

EXHIBIT A

The following is the Summary Plan Description (SPD) of the Long-Term Disability Plan for salaried, hourly, and international employees (referred to as "LTD Plan," "Salaried LTD," "SLTD," "Hourly LTD," "HLTD," or the "Plan"), sponsored by Marriott International, Inc. (the "Company"). The Plan document, which includes certain provisions of the insurance policy with Aetna Life Insurance Company (referred to as the "insurance company" or "Aetna"), forms the basis for coverage under the Plan.

The Plan document, together with the insurance policy and certificate of insurance issued by Aetna (policy number 6984434), will control in the event there is any conflict between the provisions of the Plan and this SPD. Employees of the Company who participate in the Plan agree to accept the provisions of the Plan and the insurance policy as they are today, or as they may be amended in the future. It is the participant's responsibility to know the provisions of the Plan. Participants will be informed of any major Plan changes as required by law. All Plan change notices should be kept with this information.

The Plan gives the Plan Administrator sole, absolute, and final discretion to determine eligibility for participation, to construe the terms of the Plan, and to resolve any factual issues relevant to eligibility for participation or benefit enrollment during the employee's initial eligibility period. The insurance company retains sole, absolute, and final discretion to determine entitlement to benefits, to construe the terms of the insurance policy, to resolve any factual issues relevant to the payment of benefits, and to determine eligibility for late enrollment.

The Company intends to continue the Plan indefinitely. However, because unforeseen circumstances may arise, the Company reserves the right to terminate the Plan. The Plan may be amended from time to time as authorized by the most senior Human Resources executive of the Company, as designated by the President of the Company.

All previously issued Plan booklets and announcements are obsolete.

The benefits shown in this SPD may not apply to employees represented by unions and/or covered by collective bargaining agreements, depending on the terms of those agreements.

As a Plan participant, you are responsible for updating your address on the myHR Web site. You may notify your Human Resources representative if you do not have access to the Web site. If you do not update your address information timely, you may not receive date sensitive benefit materials. You should also notify your Human Resources representative if your Social Security Number is legally changed or is incorrect.

## HOW TO CONTACT myHR®

Current employees may access the myHR Web site at www.4myHR.com for benefit plan details. You will need your Enterprise ID (EID) and EID password. If you don't know your EID or EID password, you can go on www.4myHR.com for instructions on where to retrieve your EID or EID password.

Former employees may access the myHR Web site at www.yourbenefitsresources.com/4myHR for benefit plan details.

The myHR Web site is available 24 hours a day, seven days a week, and can be accessed from any computer with Internet access.

The myHR Service Center Representatives are available at 1-888-88-4myHR (1-888-884-6947) between 9:00 a.m. and 8:00 p.m. Eastern time, Monday through Friday. Outside the United States, Puerto Rico, and Canada, call 847-883-2084. (This is a toll call.) Hearing-impaired employees can call their local relay service for TDD access.

Current international employees can obtain benefit plan details from their Human Resources representative or from the International Benefits Manager at Marriott Headquarters. The International Benefits Manager can be reached at 1-301-380-3366.

EXHIBIT A

# BENEFITS AT A GLANCE

A disability can have serious financial consequences for you and your family. The Marriott International, Inc. Long-Term Disability (LTD) Plan for employees can provide valuable protection from loss of income if you become unable to work as a result of a covered sickness or injury. The chart below offers an overview of the LTD Plan. For a thorough explanation, please read the contents of this Summary Plan Description.

| Who Can Be Covered | Amount of Benefit | When Benefits Begin | When Benefits End | Plan Limitations |
|---|---|---|---|---|
| You, if the Plan is offered at your workplace, you are in active employment in the U.S. (including in the U.S. Virgin Islands beginning in 2009), and you are a:<br><br>• A non-temporary salaried employee, or<br><br>• Are a full-time, non-temporary, hourly paid employee, and<br><br>• Have satisfied any applicable waiting period according to your workplace. | Salaried Employees:<br><br>60% of your annual pay (to a maximum annual pay of $400,000) up to a maximum benefit of $20,000 per month or $240,000 per year.<br><br>Hourly Employees:<br>50% of your annual pay (to a maximum of $360,000) up to a maximum benefit of $15,000 per month or $180,000 per year.<br><br>(See the definition of "Annual Pay" in the *Important Plan Definitions* section.) | After you have been disabled and are unable to work for 182 days due to a covered sickness or injury and are under the regular care of a physician. | In general, when you are no longer disabled or you reach age 65, or later, if you were age 60 or older when first disabled. | Benefits may not be payable if you have a pre-existing condition.<br><br>(See "Pre-Existing Condition Limitations" in the *LTD Plan Provisions* section. Other limitations also apply.)<br><br>(Also see "When Payments Will Stop" in the same section.) |

EXHIBIT A

NOTE: An international employee can be covered if he or she is covered under the International Medical Plan and is actively employed. An international employee's benefits begin after he or she has been disabled, is unable to work for 30 days due to a covered sickness or injury, and is under the regular care of a physician.

# ELIGIBILITY

### ELIGIBLE EMPLOYEES

You are eligible to participate in the Long-Term Disability (LTD) Plan if you are in active employment in the United States (including in the U.S. Virgin Islands beginning in 2009), it is offered at your workplace, and you are a:

- A non-temporary salaried employee; or
- A full-time non-temporary hourly paid employee who works the number of hours required by your workplace to be eligible for benefits.

The states of California, Hawaii, New Jersey, New York, and Rhode Island have mandatory state disability plans. Employees who work in these geographic areas can enroll in the LTD Plan. However, LTD Plan benefits will be reduced by the amount of the mandatory disability plan benefits.

### ELIGIBLE INTERNATIONAL EMPLOYEES

You are eligible to participate in the Long-Term Disability Plan if you are an international employee who is covered under the International Medical Plan and actively employed.

### WAITING PERIOD

As an eligible employee, you must have completed your waiting period as designated by your workplace before coverage begins.

### INELIGIBLE INDIVIDUALS

You are not eligible to participate in the LTD Plan if you are classified as a temporary employee, leased employee, seasonal or "pool" employee, or an independent contractor (even if you are later determined to be an "employee" as a result of a judicial or administrative determination).

In addition, dependents are not eligible to participate in the Plan.

EXHIBIT A

# ENROLLMENT

## HOW TO ENROLL

You must enroll in the Plan to be covered.

Use the myHR Web site to enroll online or enroll by calling the myHR Service Center.

You must enroll within your initial eligibility period. If you do not enroll during this time, you will be a late enrollee and must wait until the next annual enrollment period to enroll. (See "Late Enrollees" at the end of this section.)

If you enroll online, you can print a Confirmation of Enrollment, which is a copy of your benefit elections, for your records. If you enroll through a myHR Service Center Representative, a printed Confirmation of Enrollment will be mailed to your home approximately one week after you enroll. If you enroll by calling a representative and do not receive a Confirmation of Enrollment, call the myHR Service Center.

Review your Confirmation of Enrollment carefully to make sure that your benefit selections are correct. If you see a problem and do not call the myHR Service Center to correct the problem within 14 days of the Confirmation of Enrollment date, you may not be able to change your coverage until the next annual enrollment period.

If you are an international employee, you will automatically be enrolled in the Plan when you enroll in the International Medical Plan. You must enroll within your initial eligibility period. If you do not enroll during this time, you will be a late enrollee and must wait until the next annual enrollment period to enroll. (See "Late Enrollees" at the end of this section.)

## WHEN COVERAGE TAKES EFFECT

### Newly Hired Employees

Your initial eligibility period is determined by your workplace. Coverage will take effect on the day after your initial eligibility period is satisfied, provided you enrolled during your initial eligibility period and are actively at work on that date.

If you are an international employee, coverage will take effect on your hire date if you are eligible to participate in the Plan, provided you enrolled during your initial eligibility period and are actively at work on that date.

### Newly Eligible Employees

If a change in your employment status makes you newly eligible for Plan coverage, your initial eligibility period is 31 days following your status change. Coverage will take effect on the later of either:

* The date following 31 days from your employment status change; or

* The date following the completion of any applicable waiting period for your workplace,

provided you enrolled during your initial eligibility period and are actively at work on that date.

If you are an international employee and you change assignments and are now eligible to participate in the Plan, your coverage is effective as of your assignment start date, provided you enrolled during your initial eligibility period and are actively at work on that date.

### Annual Enrollment

If you enroll during the annual enrollment period, coverage will take effect on the first day of the next plan year, provided you remain eligible to participate in the Plan, are actively at work on that date, and have met the Evidence of Insurability (EOI) requirements. If EOI requirements have not been met by that date, coverage will take effect on the date the myHR Service Center receives the insurance company's approval of your coverage.

EXHIBIT A

> NOTE: Evidence of Insurability (EOI) requirements are not applicable to international employees.

**Employees Absent From Work When Coverage Is Scheduled to Begin**
If you are not actively at work on the date your Plan coverage is due to begin, coverage under the Plan will not begin. To activate coverage, you must call the myHR Service Center within 31 days of your return-to-work date to request Plan coverage. If you timely request Plan coverage, it will take effect on the date you call to request coverage.

If you are an international employee, you must call the International Benefits Manager within 31 days of your return-to-work date to request Plan coverage. If you timely request Plan coverage, it will take effect on the date you call to request coverage.

**LATE ENROLLEES**
If you do not enroll within your initial eligibility period, you will be considered a late enrollee. Late enrollees can enroll in the Plan only during the annual enrollment period and must submit Evidence of Insurability (EOI), including a statement of health.

Coverage for a late enrollee will take effect on the first day of the next plan year, provided he or she remains eligible to participate in the Plan, is actively at work on that date, and has met the EOI requirements. If EOI requirements have not been met by that date, coverage will take effect on the date the myHR Service Center receives the insurance company's approval of your coverage.

Coverage for late enrollees is not automatic and can be denied for any of the following reasons:

* Failure to submit satisfactory EOI or requested medical information;

* Misrepresentation of health history or any other information submitted;

* Health status; and/or

* Other reasons the insurance company may determine.

For international employees, if you do not enroll within your initial eligibility period, you will be considered a late enrollee. Late enrollees can enroll in the Plan only during the annual enrollment period. Coverage for a late enrollee will take effect on the first day of the next plan year, provided he or she remains eligible to participate in the Plan and is actively at work on that date.

> NOTE: The insurance company has sole responsibility for determining approval of coverage for late enrollees. The insurance company will notify you by mail of your approval or denial.

EXHIBIT A

## YOUR LTD PLAN CONTRIBUTIONS

Your contributions to the Plan are deducted from your paycheck, on an after-tax basis, each pay period. The amount of your contributions depends on your annual pay. (See the definition of "Annual Pay" in the *Important Plan Definitions* section.)

Your age as of January 1 of each plan year will be used to determine your Plan contributions and Plan benefits for the remainder of that plan year.

The amount of your contributions will change when your annual pay changes.

> NOTE: For international employees, this is a company-paid benefit. International employees do not make contributions.

For specific information about the cost of Plan coverage, visit the myHR Web site or call the myHR Service Center.

Check your paycheck stub to verify that Plan contributions are being deducted. Coverage begins when the necessary contributions are paid.

### CONTRIBUTIONS FROM PARTICIPANTS WHILE ON A LEAVE OF ABSENCE OR RECEIVING DISABILITY PAYMENTS

Your Plan coverage may continue for the duration of your approved leave of absence, up to a maximum of 24 months, provided you pay the required contributions during your absence.

You may use paid leave to pay for the cost of Plan coverage while you are on leave. If you do not use paid leave (or you do not have enough paid leave), you may be direct billed for the cost of Plan coverage. (See "Paying for Coverage When Paychecks Do Not Cover Plan Contributions" and "Payment Process" later in this section for more information.)

If you are an international employee, you may use paid leave to pay for the cost of Plan coverage while you are on leave. If you do not use paid leave (or you do not have enough paid leave), you will need to pay for the cost of Plan coverage. Please contact the International Benefits Manager to arrange payment of your LTD premium. If you do not pay the required premium, your coverage will end on your last paid-through period.

If you want information on how to continue coverage, cancel coverage, or re-enroll upon the end of your leave of absence, call the myHR Service Center.

### If You Are Off Work Due to a Covered Disability

LTD contributions are waived during the period you are receiving LTD benefit payments. However, you must continue to make your LTD contributions until your LTD benefit payments begin, including during the elimination period. (See "182-Day Elimination Period" in the *LTD Plan Provisions* section.) You must also make LTD contributions for any period after you stop receiving LTD benefit payments.

Medical, dental, vision, Health Care Spending Account, and life insurance contributions are not automatically deducted from disability checks. You will be direct billed for your contributions, if you are enrolled in those benefits. (See "Payment Process" later in this section for more information.)

> NOTE: Dependent Care Spending Account contributions will be suspended while you are on leave.

If you participate in a Short-Term Disability Plan (STD) your STD contributions are waived during the period you are receiving LTD benefits.

EXHIBIT A

## PAYING FOR BENEFITS WHEN PAYCHECKS DO NOT COVER PLAN CONTRIBUTIONS

If you are on an approved leave of absence and/or your paychecks do not cover your contributions required by the Plan, you will be direct billed for the cost of Plan coverage and you may have the ability to pre-pay the amount you owe for your benefits. If you are required to make a payment, a Billing Notice will be mailed to your address on file from the myHR Service Center.

### Payment Process
*Billing Notice*

You will receive a Billing Notice if you owe three or more weeks of benefit deductions. Billing Notices will be mailed monthly on the second Wednesday of each month. The Billing Notice will indicate the total amount due by plan. Payment will be due on the first day of the following month. Partial payments will be accepted and applied to the plans you are enrolled in based on the order listed below (you cannot pick and choose which plans to pay):

- Medical;
- Short-Term Disability (STD);
- Long-Term Disability (LTD);
- Group Term Life (GTL);
- Dental;
- Vision;
- Additional Accidental Death & Dismemberment (AD&D); and
- Health Care Spending Account.

If you receive a paycheck (for hours worked or for paid leave) before your payment is received, the amount you owe will be deducted from your paycheck. For example, if you return from a leave of absence, the amount due on your Billing Notice will be deducted from your paycheck if the myHR Service Center has not yet received your payment. If the myHR Service Center receives payment after the amount you owe is deducted from your paycheck, your payment will be applied to your future benefits coverage cost.

### Pre-Payment Option

You also have the option to pre-pay for benefits. This option accommodates employees who want to pay for their benefits in advance or catch up on benefit payments without having to wait for a Billing Notice. You can request a Pre-Payment Notice on the myHR Web site or by calling the myHR Service Center. You must include this notice with your pre-payment. Your pre-payment will be applied to the plans you are enrolled in based on the order listed on your Pre-Payment Notice.

### How to Submit Payment

Checks or money orders for benefit premium payments are to be made payable to Marriott International, Inc. and mailed to the address below. Your account number should be included on your payment. You can locate your account number on the top of your Billing Notice or Pre-Payment Notice. You must include a copy of your Billing Notice or Pre-Payment Notice with your payment.

myHR Service Center
P.O. Box 1122
Carol Stream, IL 60132-1122

If you have questions about the amount you owe for your benefits or how to submit payments, contact the myHR Service Center.

EXHIBIT A

**Cancellation of Benefits Coverage**

To keep your benefits current, you must make full payment by the due date on your Billing Notice. Benefits will be cancelled on the first Wednesday of each month if you owe 11 or more weeks of benefit contributions. Coverage will be cancelled back to the paid-through date. If you have questions, visit the myHR Web site or call the myHR Service Center. Any payments received after your coverage is cancelled will be refunded and will not extend your coverage.

EXHIBIT A

## REINSTATING COVERAGE FOLLOWING AN FMLA OR MILITARY LEAVE OF ABSENCE

If you have been absent from work on an approved Family and Medical Leave Act (FMLA) or military leave of absence, and lost coverage due to non-payment of premium or voluntary cancellation during your FMLA or military leave of absence, you may reinstate Plan coverage when you return from an FMLA or military leave by calling the myHR Service Center within 31 days of your return-to-work date or the date on your cancellation notice, whichever is later. You are not required to provide Evidence of Insurability (EOI) to have your coverage reinstated.

If you timely request reinstatement, Plan coverage will take effect on the Saturday following the week-ending date that the myHR Service Center receives notification of your return-to-work date.

For international employees, if you have been absent from work on an approved Family and Medical Leave Act (FMLA) or military leave of absence, and lost coverage due to non-payment of premium or voluntary cancellation during your FMLA or military leave of absence, you may reinstate Plan coverage when you return from an FMLA or military leave by calling the International Benefits Manager within 31 days of your return-to-work date.

If you timely request reinstatement, Plan coverage will take effect on the first of the calendar month following your notification to the International Benefits Manager.

## WITHDRAWING FROM THE PLAN

You may voluntarily withdraw from the LTD Plan and cancel your coverage at any time during the plan year. (See "Request to Cancel" in the *Events That May Affect Plan Coverage* section for more information.)

> NOTE: This does not apply to international employees.

EXHIBIT A

## LTD Plan Provisions

### HOW THE PLAN WORKS

In general, if you become disabled due to a covered injury or sickness while you are an LTD Plan participant, you will receive a monthly payment based on your pre-disability annual pay. (See the definition of "Annual Pay" in the *Important Plan Definitions* section.) This monthly benefit will be subject to certain limitations and provisions of the Plan. This section of the Summary Plan Description explains how the Plan works and the Plan's benefit limitations.

### Disability/Disabled Defined

You are disabled when Aetna determines that, due to your sickness or injury, you:

- Are limited from performing the material and substantial duties of your regular occupation;
- Have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and
- Are under the regular care of a physician.

After 24 months of payments, you are disabled when Aetna determines that, due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

Aetna may require you to be examined by a physician, other medical practitioner, and/or vocational expert of Aetna's choice. Aetna will pay for this examination. Aetna can require an examination as often as it is reasonable to do so. Aetna may also require you to be interviewed by an authorized Aetna representative.

The insurance company, not your physician, will determine whether or not you are disabled according to the Plan's definition of disability.

From time to time, the insurance company will assess the extent of your disability and your entitlement to benefits.

### 182-Day Elimination Period

If you are eligible for disability benefits, payments may begin after you have been disabled and unable to work for 182 days. This 182-day period is called the "elimination period." The elimination period begins on the first day you are unable to work because of a disabling condition.

> NOTE: If you are an international employee and you are eligible for disability benefits, payments may begin after you have been disabled and unable to work for 30 days. This 30-day period is called the "elimination period." The elimination period begins on the first day you are unable to work because of a disabling condition.

If you return to work for 30 or fewer days during the elimination period, but cannot continue to work because of your disability, the insurance company will count only those days you are disabled toward satisfying the elimination period.

During your elimination period and while you are receiving Plan benefits, you may use up to 40 hours per week of paid leave (vacation, sick pay, Paid Time Off [PTO]) and holiday pay (if you use paid leave in the week in which a holiday falls). To do so, contact your manager and request paid leave.

If you do not have paid leave or do not wish to use paid leave during the elimination period, you will not receive any pay during your elimination period.

EXHIBIT A

### Recurrent Periods of Disability

If your current disability is related to or due to the same cause(s) as your prior disability for which Aetna made a payment, your current disability will be treated as part of your prior disability and you will not have to complete another elimination period if:

- You were continuously insured under the Plan for the period between your prior claim and your recurrent disability; and

- Your recurrent disability occurs within six months of the end of your prior claim.

Your recurrent disability will be subject to the same terms of the Plan as your prior claim for disability benefits.

If your current disability is unrelated to your prior disability for which Aetna made a payment, your current disability will be treated as a new LTD claim. The new claim will be subject to all of the provisions of the Plan and you will be required to satisfy a new elimination period.

Any disability that occurs after six months from the date your prior claim ended will be treated as a new LTD claim. The new claim will be subject to all of the provisions of the Plan and you will be required to satisfy a new elimination period.

If you become entitled to payments under any other group long-term disability plan, you will not be eligible for benefits under the LTD Plan.

### Pre-Existing Condition Limitations

The LTD Plan may not pay benefits if you become disabled as the result of a pre-existing condition as defined by the LTD Plan.

You have a pre-existing condition if:

- You received medical treatment, consultation, care, or services, including diagnostic measures, or took prescribed drugs or medicines in the 12 months just prior to your effective date of Plan coverage; and

- The disability begins in the first 12 months after your effective date of Plan coverage.

If you were an hourly employee who became eligible for salaried benefits, your length of participation in the Marriott International, Inc. Hourly Long-Term Disability Plan (Hourly LTD) will apply toward the Salaried LTD Plan pre-existing condition limitation period if you were enrolled in Hourly LTD at the time you became eligible for Salaried LTD.

### Disabilities That Have a Limited Pay Period

Disabilities due to sickness or injury that are primarily based on self-reported symptoms, and disabilities due to mental illness, have a limited pay period of up to 24 months.

Aetna will continue to send you payments beyond the 24-month period if you meet one or both of these conditions:

1. If you are confined to a hospital or institution at the end of the 24-month period, Aetna will continue to send you payments during your confinement.

   If you are still disabled when you are discharged, Aetna will send you payments for a recovery period of up to 90 days.

   If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Aetna will send payments during that additional confinement and for one additional recovery period up to 90 more days.

EXHIBIT A

2. In addition to Item 1, if after the 24-month period for which you are receiving payments you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Aetna will send payments during the length of the reconfinement.

Aetna will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever comes first.

Aetna will not apply the mental illness limitation to dementia if it is a result of:

- Stroke;

- Trauma;

- Viral infection;

- Alzheimer's disease; or

- Other conditions not listed that are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

## When Payments Will Stop

Aetna will stop sending you payments and your claim will end on the earliest of the following:

- During the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;

- After 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;

- If you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;

- The end of the maximum period of payment;

- The date you are no longer disabled under the terms of the Plan, unless you are eligible to receive benefits under Aetna's Rehabilitation and Return-to-Work Assistance Program;

- The date you do not cooperate or participate in Aetna's Rehabilitation and Return-to-Work Assistance Program;

- The date you do not submit proof of continuing disability;

- After 12 months of payments if you are considered to reside outside the United States or Canada (you will be considered to reside outside the United States or Canada if you have been outside the United States or Canada for a total period of six months or more during any 12 consecutive months of benefits) (does not apply to international employees); or

- The date you die.

EXHIBIT A

## Maximum Period of Payment

The maximum period of payment allowed has been reached based on the following age criteria, even though you remain disabled. You may be required to provide a certified birth certificate to verify your age.

| Disability Begins | Maximum LTD Benefit Period of Payment |
|---|---|
| Before 60th birthday | To age 65 (but not less than 60 months) |
| Age 60–64 | 60 months |
| Age 65–69 | To age 70 (but not less than 12 months) |
| Age 70 and over | 12 months |

## Amount of Disability Benefits

After you are disabled and satisfy the 182-day elimination period (30-day elimination period for international employees), the LTD Plan may begin paying monthly benefits based on your annual pay, up to a maximum salary of $400,000 for salaried employees and up to a maximum salary of $360,000 for hourly employees. (See the definition of "Annual Pay" in the *Important Plan Definitions* section.)

If you are a salaried employee or an hourly paid employee who is eligible for salaried benefits and works the number of hours required by your workplace to be eligible for Plan benefits your monthly disability benefits are calculated at 60% of your annual pay (divided by 12 months); the maximum benefit payment is limited to $240,000 per year or $20,000 per month.

If you are a full-time non-temporary hourly employee, your monthly disability benefits are calculated at 50% of your annual pay (divided by 12 months); the maximum benefit payment is limited to $180,000 per year or $15,000 per month.

The minimum monthly benefit is the greater of $100 or 10% of your gross disability payment.

Certain types of other income, such as Social Security income, may reduce the LTD benefit. (See "Deductible Sources of Income" later in this section for more information.)

Disability benefits are paid on a monthly basis. For the purpose of determining partial week payments, a daily benefit is calculated by dividing the monthly disability benefit by 30 days.

## Total Benefit Cap

Your total monthly benefit (including all benefits provided under the Plan) will not exceed 100% of your monthly earnings. However, if you are participating in Aetna's Rehabilitation and Return-to-Work Assistance Program, your total monthly benefit (including all benefits provided under the Plan) will not exceed 110% of your monthly earnings.

## Fluctuation in Disability Earnings

If your disability earnings routinely fluctuate widely from month to month, Aetna may average your disability earnings over the most recent three months to determine if your claim should continue.

If Aetna averages your disability earnings, it will not terminate your claim unless the average of your disability earnings from the last three months exceeds 80% of your indexed monthly earnings.

Aetna will not pay you for any month during which disability earnings exceed 80% of your indexed monthly earnings.

EXHIBIT A

**Deductible Sources of Income**

The disability benefit you receive from the LTD Plan will be coordinated (reduced) if you receive, or are entitled to receive, certain other types of income associated with the same disabling condition while you are disabled.

The other income that will reduce your disability benefits from the LTD Plan includes, but is not limited to:

- The amount you receive or are entitled to receive under any occupational disease law, Workers' Compensation law, or any other act or law with similar intent;

- The amount you receive or are entitled to receive as disability income payments under any state compulsory benefit act or law, or other group insurance plan;

- Severance;

- The amount that you, your spouse, and your children receive or are entitled to receive as disability payments because of your disability, under the United States Social Security Act, the Canadian Pension Plan, the Quebec Pension Plan, or any similar act or plan;

- The amount you receive under Title 46, United States Code Section 688 (The Jones Act);

- The amount you receive under the mandatory portion of any "no-fault" motor vehicle plan; and/or

- The amount you receive from a third party (after subtracting attorney's fees) by judgment, settlement, or otherwise.

If you receive a lump-sum payment from any deductible sources of income, the lump sum will be prorated on a monthly basis over the time period for which the sum was given. If no time period is stated, Aetna will use a reasonable one.

| SALARIED EMPLOYEE, OR HOURLY EMPLOYEE ELIGIBLE FOR SALARIED BENEFITS, DISABILITY BENEFIT EXAMPLE | |
| --- | --- |
| A salaried employee who earned $1,517 per month ($18,204 per year) and who now receives a $270 monthly payment from Social Security | |
| Salaried LTD monthly benefit (60% of $1,517) | $910.20 |
| Monthly benefit from Social Security | $270.00 |
| Net monthly benefit employee will receive from the LTD Plan ($910.20 minus $270) | $640.20 |

| HOURLY EMPLOYEE DISABILITY BENEFIT EXAMPLE | |
| --- | --- |
| An hourly employee who earned $1,517 per month ($18,204 per year) and who now receives a $270 monthly payment from Social Security | |
| Hourly LTD monthly benefit (50% of $1,517) | $758.50 |
| Monthly benefit from Social Security | $270.00 |
| Net monthly benefit employee will receive from the LTD Plan ($758.50 minus $270) | $488.50 |

EXHIBIT A

**Non-Deductible Sources of Income**
Payments that will not reduce your gross disability payments from the LTD Plan include, but are not limited to:

- 401(k) plans, profit sharing plans, and thrift plans (for example, the Marriott International, Inc. Employees' 401(k) Plan);

- Tax-sheltered annuities;

- Stock ownership plans (for example, the Marriott International, Inc. Comprehensive Stock and Cash Incentive Plan);

- Non-qualified plans of deferred compensation (for example, the Marriott International, Inc. Executive Deferred Compensation Plan);

- Pension plans for partners;

- Military pension and disability income plans;

- Credit disability insurance;

- Franchise disability income plans;

- A retirement plan from the Company (for example, the Marriott International, Inc. Employees' Profit Sharing, Retirement and Savings Plan and Trust) or another employer;

- Individual retirement accounts (IRAs);

- Individual disability income plans;

- A retirement disability plan under the United States Social Security Act;

- Paid leave (vacation or Paid Time Off [PTO]), and sick leave; and/or

- Holiday pay.

## APPLYING FOR OTHER SOURCES OF INCOME

It is your responsibility to report any other income received while you are disabled. Also, it is important that you apply for any other source of income to which you may be entitled. If you do not do so, the insurance company may estimate the amount of the other income and reduce your LTD benefits by this estimated amount. The insurance company may continue to use the estimated other income until the amount of the actual entitlement is known.

## SOCIAL SECURITY BENEFITS

In order to be eligible for assistance from Aetna's Social Security Claimant Advocacy Program, you must be receiving monthly payments from Aetna. Aetna can provide expert advice regarding your claim and assist you with your application or appeal.

Receiving Social Security benefits may enable:

- You to receive Medicare after 24 months of disability payments;

- You to protect your retirement benefits; and

- Your family to be eligible for Social Security benefits.

EXHIBIT A

Aetna can assist you in obtaining Social Security disability benefits by:

- Helping you find appropriate legal representation;
- Obtaining medical and vocational evidence; and
- Reimbursing pre-approved case management expenses.

## SURVIVOR BENEFIT

When Aetna receives proof that you have died, it will pay your eligible survivor a lump-sum benefit equal to three months of your gross disability payment if, on the date of your death:

- Your disability had continued for 182 or more consecutive days (30 or more consecutive days for international employees); and
- You were receiving or were entitled to receive payments under the Plan.

If you have no eligible survivors, payment will be made to your estate, unless there is none. In this case, no payment will be made.

However, Aetna will first apply the survivor benefit to any overpayment that may exist on your claim.

You may receive your three-month survivor benefit prior to your death if you have been diagnosed as terminally ill.

Aetna will pay you a lump-sum amount equal to three months of your gross disability payment if:

- You have been diagnosed with a terminal illness or condition;
- Your life expectancy has been reduced to less than 12 months; and
- You are receiving monthly payments.

Your right to exercise this option and receive payment is subject to the following:

- You must make this election, in writing, to Aetna; and
- Your physician must certify, in writing, that you have a terminal illness or condition and your life expectancy has been reduced to less than 12 months.

This benefit is available to you on a voluntary basis and will only be payable once.

If you elect to receive this benefit prior to your death, no three-month survivor benefit will be payable upon your death.

## WORK INCENTIVE BENEFIT

After you have satisfied the elimination period for LTD benefits, you may be eligible for a Work Incentive Benefit if proof is received that you are treated regularly by a physician and you are working at your assessed potential (for example, on a part-time basis or at a less demanding function) while recovering from your covered sickness or injury.

Aetna will send you the monthly payment if you are disabled and your monthly disability earnings, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

During the first 12 months of payments, while working, your monthly payment will not be reduced as long as disability earnings plus the gross disability payment do not exceed 100% of Indexed Monthly Earnings.

EXHIBIT A

If you are disabled and your monthly disability earnings are from 20% through 80% of your indexed monthly earnings, due to the same sickness or injury, Aetna will figure your payment as follows:

1. Add your monthly disability earnings to your gross disability payment.

2. Compare the answer in Item 1 to your indexed monthly earnings.

If the answer from Item 1 is less than or equal to 100% of your indexed monthly earnings, Aetna will not further reduce your monthly payment. If the answer from Item 1 is more than 100% of your indexed monthly earnings, Aetna will subtract the amount over 100% from your monthly payment.

After 12 months of payments, while working, you will receive payments based on the percentage of income you are losing due to your disability.

1. Subtract your disability earnings from your indexed monthly earnings.

2. Divide the answer in Item 1 by your indexed monthly earnings. This is your percentage of lost earnings.

3. Multiply your monthly payment by the answer in Item 2.

This is the amount Aetna will pay you each month. Aetna may require you to send proof of your monthly disability earnings at least quarterly. Aetna will adjust your payment based on your quarterly disability earnings.

As part of your proof of disability earnings, Aetna can require that you send it appropriate financial records that Aetna believes are necessary to substantiate your income.

| WORK INCENTIVE BENEFIT CALCULATIONS EXAMPLE (Based on a salaried employee whose annual pay is $18,000) | | | |
|---|---|---|---|
| Work Incentive Benefit, up to First 12 Months of Disability | | Benefit After First 12 Months of Disability | |
| Employee's pre-disability monthly earnings | $1,500 | Employee's indexed monthly earnings | $1,500 |
| LTD gross disability payment ($1,500 x 60%) | $ 900 | Earnings from less demanding job | $ 700 |
| Monthly earnings from less demanding job | $ 700 | Loss of earnings amount ($1,500 - $700) | $ 800 |
| Total gross disability payment plus monthly earnings ($900 + $700) | $1,600 | Loss of earnings percentage: $800 / $1,500 = 53.3% | 53% |
| Reduced gross disability payment ($900 - $100 [$1,600 - $1,500]) | $ 800 | 60% of indexed monthly earnings (60% x $1,500) | $ 900 |
| Combined total of reduced gross disability payment and monthly earnings ($800 + $700) | $1,500 | Reduced LTD benefit ($900 x 53.3%) | $ 480 |
| | | Combined total of reduced LTD benefit and earnings from less demanding job ($480 + 700) | $1,180 |

EXHIBIT A

## REHABILITATION AND RETURN-TO-WORK ASSISTANCE PROGRAM

Aetna has a vocational Rehabilitation and Return-to-Work Assistance Program available to assist you in returning to work. Aetna will determine whether you are eligible for this program, at its sole discretion. In order to be eligible for rehabilitation services and benefits, you must be medically able to engage in a return-to-work program.

One of Aetna's rehabilitation professionals will review your claim file to determine if a rehabilitation program might help you return to gainful employment.

As your file is reviewed, medical and vocational information will be analyzed to determine an appropriate return-to-work program. If Aetna determines you are eligible to participate in a Rehabilitation and Return-to-Work Assistance Program, you must participate in order to receive disability benefits. Aetna will make the final determination of your eligibility for participation in the program. Aetna will provide you with a written Rehabilitation and Return-to-Work Assistance plan developed specifically for you.

You must comply with the terms of the Rehabilitation and Return-to-Work Assistance plan in order to receive disability benefits. The specifics of the Rehabilitation and Return-to-Work Assistance plan are at Aetna's sole discretion and may include, but are not limited to, the following services and benefits:

- Coordination with the Company to assist you to return to work;
- Adaptive equipment or job accommodations to allow you to work;
- Vocational evaluation to determine how your disability may impact your employment options;
- Job placement services;
- Resume preparation;
- Job seeking skills training; and/or
- Education and retraining expenses for a new occupation.

**Additional Benefits Aetna Will Pay While You Participate in a Rehabilitation and Return-to-Work Assistance Program**

Aetna will pay an additional disability benefit of 10% of your gross disability payment to a maximum benefit of $1,000 per month.

This benefit is not subject to policy provisions that would otherwise increase or reduce the benefit amount. (See "Deductible Sources of Income" earlier in this section for income that reduces disability benefits.) However, the total benefit cap will apply.

In addition, Aetna will make monthly payments to you for three months following the date your disability ends if Aetna determines you are no longer disabled while you are:

- Participating in the Rehabilitation and Return-to-Work Assistance Program; and
- Not able to find employment.

This benefit payment may be paid in a lump sum.

Benefit payments will end on the earlier of the following dates:

- The date Aetna determines that you are no longer eligible to participate in Aetna's Rehabilitation and Return-to-Work Assistance Program; or
- Any other date on which monthly payments would stop in accordance with the Plan.

> NOTE: If you are disabled and incurring child care expenses for your dependent child(ren), you may also receive a child care expense amount of $350 per month, per dependent child, up to $1,000 per month.

EXHIBIT A

## WHAT IS NOT COVERED

The LTD Plan does not cover any disabilities caused by, contributed to, or resulting from the following:

- Intentionally self-inflicted injuries;
- Active participation in a riot;
- Loss of professional license, occupational license, or certification;
- Commission of a crime for which you have been convicted under state or federal law;
- Attempt to commit or commission of a crime under state or federal law;
- Disability due to war, declared or undeclared, or any act of war; or
- Pre-existing condition.

Also, Aetna will not pay a benefit during any period of incarceration.

EXHIBIT A

# EVENTS THAT MAY AFFECT PLAN COVERAGE

## WHEN COVERAGE ENDS

Your coverage under the Plan ends on the earliest of the following events:

- The Friday coinciding with or following the date of your termination of employment.
- The Friday coinciding with or following the date of you are no longer eligible for coverage.
- Your paid-through date of coverage if you are being cancelled for non-payment of premiums.
- The date you make the request to cancel Plan coverage.
- The date the Plan is terminated.
- The Friday coinciding with or following the date of your death.
- The date determined by the Plan Administrator, if you intentionally commit a fraudulent act for purposes of obtaining coverage or filing claims, or allow someone else to use your coverage.
- The date you engage in serious misconduct.
- If you are an international employee, your date of termination.

Aetna will provide coverage for a payable claim that occurs while you are covered under the policy or Plan.

## TERMINATION OF EMPLOYMENT

Coverage ends at midnight on the Friday coinciding with or following the date of your termination of employment. Coverage cannot be extended by paid leave (vacation, sick pay, or Paid Time Off [PTO]) or severance paid after your termination of employment. If premium payments are current on the date of your termination of employment, coverage will be available for a claim for a disability which began before that date, and a failure to continue premium payments through the elimination period will not impact the eligibility of that claim.

For international employees, coverage ends at midnight on the date of your termination of employment. Coverage cannot be extended by paid leave (vacation, sick pay, or Paid Time Off [PTO]) or severance paid after your termination of employment. If premium payments are current on the date of your termination of employment, coverage will be available for a claim for a disability which began before that date.

## LEAVE OF ABSENCE

Your coverage may continue for the duration of your approved leave of absence, up to a maximum of 24 months, provided you pay the required contributions during your absence. If you do not pay the required contributions, your coverage ends on the last paid-through coverage date. (See "Payment Process" in the *Your LTD Plan Contributions* section for more information.)

If you terminate employment by not returning to work on schedule or by notifying your manager that you are not returning to work, coverage ends on the Friday coinciding with or following the last day of your approved leave of absence or the Friday coinciding with or following the date you notify your manager that you are not returning to work, whichever is applicable, provided your contributions are paid up to date in full at the time of termination.

For international employees, if you terminate employment by not returning to work on schedule or by notifying your manager that you are not returning to work, coverage ends on the last day of your approved leave of absence or the date you notified your manager that you are not returning to work, whichever is applicable, provided contributions are paid up to date in full at the time of termination.

EXHIBIT A

(See "If You Are Off Work Due to a Covered Disability" in the *Your LTD Plan Contributions* section for information on waiving your LTD contributions.)

(Also see "Reinstating Coverage Following an FMLA or Military Leave of Absence" in the *Your LTD Plan Contributions* section for more information.)

### FAILURE TO PAY CONTRIBUTIONS
If you do not send the myHR Service Center the total amount requested on your bill by the due date, coverage ends on your last paid-through coverage date.

> NOTE: This doe not apply to international employees.

### REQUEST TO CANCEL
You may voluntarily withdraw from the Plan and cancel your coverage at any time during the plan year by using the myHR Web site or by calling the myHR Service Center. Coverage will be canceled on the date you make the request to cancel Plan coverage.

If participation in the Plan ends but contributions are still being deducted from your paycheck, you should call the myHR Service Center immediately. Erroneous contributions will not entitle you to extend your coverage under the Plan.

> NOTE: If you voluntarily cancel your coverage and later wish to re-enroll, you will be considered a late enrollee (see "Late Enrollee" in the *Enrollment* section) and will not be able to re-enroll in the Plan until the next annual enrollment period, unless you were on an FMLA or military leave (see "Reinstating Coverage Following an FMLA or Military Leave of Absence" in the *Your LTD Plan Contributions* section) when you voluntarily canceled your coverage.

> NOTE: "Request to cancel" does not apply to international employees.

### INELIGIBILITY TO PARTICIPATE
If, for any reason other than those listed in this section, you become ineligible to participate in the Plan, coverage ends on the Friday coinciding with or next following the date eligibility is lost. For international employees, if, for any reason other than those listed in this section, you become ineligible to participate in the Plan, coverage ends the date eligibility is lost.

### DEATH
Coverage ends on the Friday coinciding with or next following the date of your death. For international employees, coverage ends on the date of your death.

### LABOR DISPUTE
Coverage ends on the date you stop actively working due to a labor dispute, including any strike, work slowdown, or lockout.

EXHIBIT A

## FRAUDULENT ACT/SEVERE MISCONDUCT

If you intentionally:

- Permit any non-covered person to use Plan coverage,

- Furnish incorrect or misleading information when filing a claim, or

- Furnish incorrect or misleading information in a statement made for the purpose of obtaining coverage,

the Plan Administrator has the authority to cancel all Company-sponsored plan coverage, and to make you ineligible to participate in any Company-sponsored plan. If this action is taken, you will be given written notice that your coverage is canceled effective on the date specified in the written notice, and you will no longer be covered under the Plan. In addition, civil and/or criminal penalties can result from these acts.

## TERMINATION OF THE PLAN

Coverage ends on the date, if any, that the Plan itself is terminated.

EXHIBIT A

# HOW TO FILE A CLAIM

## IF YOU DO NOT PARTICIPATE IN THE SALARIED SHORT-TERM DISABILITY PLAN

Disability benefits are not paid automatically. You must report a claim for LTD benefits to Aetna within 30 days from the day you become disabled. If you do not report and show proof of the claim in a timely manner, you must show to the insurance company's satisfaction that there was good cause for the delay.

## IF YOU ALSO PARTICIPATE IN THE SALARIED SHORT-TERM DISABILITY PLAN

If you are totally disabled for more than 182 days and are eligible for LTD benefits, Aetna will convert your benefits from Salaried STD to Salaried LTD.

Your attending physician must continue to provide information requested by Aetna, including: the diagnosis; specific and complete dates of disability; all dates of treatment; if applicable, the type of surgery and date performed; and an estimated return-to-work date. All information should be submitted directly to Aetna so that benefit checks are not delayed.

> NOTE: This does not apply to international employees.

## TO REPORT A CLAIM

1.  Notify your manager to report your absence.
2.  See your health care provider.
3.  Call Aetna at the toll-free number: 1-877-706-8776
    Be prepared to provide the information below. If someone else makes the call on your behalf, he or she will need to provide this information:

    *   Your name and Social Security Number (if applicable);
    *   Your complete address and phone number;
    *   Your date of birth;
    *   Your occupation (or job title);
    *   Your manager's name and phone number;
    *   A brief description of your medical condition or date and description of your injury;
    *   The cause of your medical condition (sickness, injury, and whether it is work-related);
    *   The dates of your first and most recent physician visits for this condition and your next scheduled visit with your health care provider for this condition;
    *   Your physician's name, address, and phone number;
    *   Your last day worked and your first day of absence from work due to this condition; and
    *   The date you expect to return to work (if you know), or the actual date if you have already returned to work at the time you call.

4.  Note your claim number and the telephone number for your claim contact. You will need this when you have questions about your claim.

January 2010

EXHIBIT A

You have the option to report your disability claim by filing a written notice of claim. You and your manager must fill out your respective sections of the claim form. Then, give the form to your attending physician. Your physician should fill out his or her section of the form and send it directly to Aetna.

International employees can either report the claim by telephone or by filing a written notice of the claim. If you call about the claim, please contact Aetna at 1-614-933-6000 and request to be transferred to the Marriott phone queue. If you file a written notice of the claim, the claim form can be obtained from the International Benefits Manager. The International Benefits Manager can be reached at 1-301-380-3366.

### Information Needed as Proof of Your Claim

Your proof of claim, provided at your expense, must show:

- That you are under the regular care of a physician;

- The date your disability began;

- The cause of your disability;

- The extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and

- The name and address of any hospital or institution where you received treatment, including all attending physicians.

Aetna may request that you send proof of continuing disability indicating that you are under the regular care of a physician. This proof, provided at your expense, must be received within 45 days of a request by Aetna. In some cases, you will be required to give Aetna authorization to obtain additional medical information and to provide non-medical information as part of your proof of claim, or proof of continuing disability. Aetna will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

### Claim Processing

Aetna will give you notice of the decision no later than 45 days after the claim is filed. This time period may be extended twice by 30 days if Aetna both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies you of the circumstances requiring the extension of time and the date by which Aetna expects to render a decision.

If such an extension is necessary due to your failure to submit the information necessary to decide the claim, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice within which to provide the specified information. If you deliver the requested information within the time specified, any 30-day extension period will begin after you have provided that information. If you do not deliver the requested information within the time specified, Aetna may decide your claim without that information.

### If Your Claim Is Denied

If your claim for benefits is denied, in whole or in part, the notice of adverse benefit determination under the Plan will:

- State the specific reason(s) for the determination;

- Reference specific Plan provision(s) on which the determination is based;

- Describe additional material or information necessary to complete the claim and why such information is necessary;

- Describe Plan procedures and time limits for appealing the determination, your right to obtain information about those procedures, and the right to sue in federal court; and

EXHIBIT A

- Disclose any internal rule, guidelines, protocol, or similar criterion relied on in making the adverse determination (or state that such information will be provided free of charge upon request).

Notice of the determination may be provided in written or electronic form. Electronic notices will be provided in a form that complies with any applicable legal requirements.

## LEGAL PROCEEDINGS
You can start legal action regarding your claim 60 days after proof of claim has been given and up to three years from the time proof of claim is required, unless otherwise provided under federal law.

## RECOVERY OF OVERPAYMENTS
Aetna has the right to recover any overpayments due to:

- Fraud;

- Any error Aetna makes in processing a claim; and

- Your receipt of deductible sources of income.

You must reimburse Aetna in full. Aetna will determine the method by which the repayment is to be made.

Aetna will not recover more money than the amount Aetna paid you.

EXHIBIT A

# Your Appeal Rights

## ELIGIBILITY/PARTICIPATION APPEALS

If you believe that your request to participate in the Plan has been administered incorrectly, call the myHR Service Center at 1-888-88-4myHR (1-888-884-6947) to speak with a myHR Service Center Representative.

The myHR Service Center Representative will discuss your eligibility and/or participation issue with you and make a determination. If you disagree with the myHR Service Center Representative's determination, you will be transferred to the myHR Service Center Manager for additional assistance. If you disagree with the Manager's determination, you may appeal the eligibility and/or participation issues up to two levels. The appeals process is described below.

> NOTE: If you are an international employee and you believe that your request to participate in the Plan has been administered incorrectly, contact your local Director of Human Resources.
>
> The Director will discuss your eligibility and/or participation issue with you and make a determination. If you disagree with the Director of Human Resources' determination, you may appeal the eligibility and/or participation issues up to two levels. The appeals process is described below.

### Level I Eligibility/Participation Appeal

To file a first level review of the myHR Service Center Manager's determination, you must request a Level I Eligibility/Participation Appeal Form from the Manager.

Upon request, the Manager will mail you a Level I Eligibility/Participation Appeal Form within three business days.

You must send the completed and signed Level I Eligibility/Participation Appeal Form and copies of any documents or records that support your request to:

Benefit Determination Review Team
P.O. Box 1407
Lincolnshire, IL 60069-1407

> NOTE: If you are an international employee, to file a first level review of the Director of Human Resources' determination, you must request a Level I Eligibility/Participation Appeal Form from the Director. Upon request, the Director will email you a Level I Eligibility/Participation Appeal Form within three business days.
>
> You must send the completed and signed Level I Eligibility/Participation Appeal Form and copies of any documents or records that support your request to:
>
> Marriott International
> Attn: International Benefits Manager, Dept 52/931.20
> 10400 Fernwood Road
> Bethesda, MD 20817 U.S.A.
>
> 1-301-380-3366

You must send your first written appeal (Level I) to the Benefit Determination Review Team within 90 days of the statement date on Page 1 of the Level I Eligibility/Participation Appeal Form.

EXHIBIT A

If you do not send the Level I appeal within the 90-day period, your appeal will not be reviewed and you will forfeit any right to any further review of your eligibility and/or participation issue.

If you timely file your appeal but it cannot be processed because, for example, you did not follow the correct procedures for filing an appeal, the Benefit Determination Review Team (the "Team") will notify you in writing as soon as possible and tell you what steps you must take to have your request reviewed.

You will usually receive written notice of the Team's decision within 30 days of the date the Team receives your appeal. You will be notified if special circumstances require more than 30 days. In no case will the review process take longer than 60 days from the date your Level I appeal was received by the Team. If you are requested to provide additional information to process your appeal, you will have 45 days to provide the additional information. (The actual due date is stated in the notice.) The days from the date you are sent the notice to the due date for the requested information (or, if earlier, the date you respond to the request) will not be counted as part of the time by which the Team must make a decision on your appeal. If you do not send the additional information by the due date, your appeal will be reviewed without the information.

If your appeal is denied, the written notice will explain the reasons for the denial and provide you with instructions on how to submit a Level II Eligibility/Participation Final Appeal if you are not satisfied with the Level I review.

Level II Eligibility/Participation Final Appeal
To file a second and final review of the eligibility and/or participation issue, send a letter to the Plan Administrator at:

Marriott International, Inc.
Benefits Department 52-935.62
10400 Fernwood Road
Bethesda, MD 20817

You must send your final written appeal (Level II) to the Plan Administrator within 60 days of the date listed in the Level I denial letter. Your final Level II appeal should include the following:

- Reasons for the appeal;

- Copies of any documents or records that support your position;

- Factors you believe were not considered in your first appeal; and

- Additional pertinent information that may have been received after you filed your first appeal.

The Plan Administrator will review your Level II appeal and make a final decision. You will usually receive written notice of this decision within 60 days of the date the Plan Administrator receives your appeal. You will be notified if special circumstances require more than 60 days. In no case will the review process take longer than 120 days from the date your Level II appeal was received by the Plan Administrator.

The Plan Administrator has full discretionary authority to interpret the provisions of the Plan with respect to eligibility and participation. All decisions of the Plan Administrator are final and binding on all parties.

NOTE: If you do not hear from the Plan Administrator within 60 days from the date you requested a review, contact the Plan Administrator to make sure your appeal was received.

EXHIBIT A

## BENEFIT CLAIMS APPEALS

### How to Submit a Benefit Claims Appeal

If you receive a notice of adverse benefit determination, you have 180 days from the receipt of the notice to file a written appeal. Requests for an appeal should be sent to the address specified in the claim denial.

### Determination of Appeal

A decision on review will be made no later than 45 days following receipt of the written request for review. If Aetna determines that special circumstances require an extension of time for a decision on review, the review period may be extended by an additional 45 days (90 days in total). Aetna will notify you in writing if an additional 45-day extension is needed.

If an extension is necessary due to your failure to submit the information necessary to decide the appeal, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice to provide the specified information. If you deliver the requested information within the time specified, the 45-day extension of the appeal period will begin after you have provided that information. If you do not deliver the requested information within the time specified, Aetna may decide your appeal without that information.

You will have the opportunity to submit written comments, documents, or other information in support of your appeal. You will have access to all relevant documents as defined by applicable U.S. Department of Labor regulations. The review of the adverse benefit determination will take into account all new information, whether or not presented or available at the initial determination. No deference will be afforded to the initial determination.

The review will be conducted by Aetna and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate. In the case of a claim denied on the grounds of a medical judgment, Aetna will consult with a health care professional with appropriate training and experience. The health care professional who is consulted on appeal will not be the individual who was consulted during the initial determination, or a subordinate. If the advice of a medical or vocational expert was obtained by the Plan in connection with the denial of your claim, Aetna will provide you with the names of each such expert, regardless of whether the advice was relied upon.

A notice that your request on appeal is denied will contain the following information:

- The specific reason(s) for the determination;

- A reference to the specific Plan provision(s) on which the determination is based;

- A statement disclosing any internal rule, guidelines, protocol, or similar criterion relied on in making the adverse determination (or a statement that such information will be provided free of charge upon request);

- A statement describing your right to bring a civil suit under federal law;

- A statement that you are entitled to receive upon request, and without charge, reasonable access to or copies of all documents, records, or other information relevant to the determination; and

- The statement, "You or your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your state insurance regulatory agency."

Notice of the determination may be provided in written or electronic form. Electronic notices will be provided in a form that complies with any applicable legal requirements.

Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

EXHIBIT A

# IMPORTANT PLAN DEFINITIONS

## ACTIVELY AT WORK OR ACTIVE EMPLOYMENT

An employee working for the Company for earnings that are paid regularly and performing the material and substantial duties of the employee's regular occupation.

An employee is reporting to work on a current basis in accordance with the employee's usual work schedule. An employee who is off work, on leave without pay, or on a disability leave is not actively at work. On the day your coverage is scheduled to begin, you must be actively at work on that day for one full day for Plan coverage to begin.

Paid leave (vacation, sick pay, and Paid Time Off [PTO]) is considered active employment.

## ANNUAL ENROLLMENT

A period of time each fall when you can enroll for benefits or change your benefit selections. The enrollment and changes take effect on the first day of the next plan year, provided all Plan requirements have been met.

## ANNUAL PAY

Salaried Employees, or Hourly Employees Eligible for Salaried Benefits
For purposes of calculating benefit contributions and the coverage amount under the Plan, your annual pay is calculated as your primary hourly rate of pay (rate 1 in the payroll system) times 2,080, prior year bonus, plus prior year reported tips and prior year commissions. Prior year commissions include all pay coded as commissions in Marrpay®, including service charge distributions. (Prior year reported tips and prior year commissions will be annualized if you were newly hired in the prior year.) The definition includes bonuses under the Management Bonus Plan, but does not include SPIFs (MVCI). Your annual pay amount does not change if the actual number of hours you work per week varies or if your actual pay is based on a rate other than rate 1 in the payroll system.

Full-Time Non-Temporary Hourly Employees
For purposes of calculating benefit contributions and the coverage amount under the Plan, your annual pay is calculated as your primary hourly rate of pay (rate 1 in the payroll system) times 2,080, plus prior year reported tips and prior year commissions. Prior year commissions include all pay coded as commissions in Marrpay®, including service charge distributions. (Prior year reported tips and prior year commissions will be annualized if you were newly hired in the prior year.) The definition does not include bonuses, including, but not limited to, SPIFs (MVCI) and the Management Bonus Plan. Your annual pay amount does not change if the actual number of hours you work per week varies or if your actual pay is based on a rate other than the rate 1 in the payroll system.

> NOTE: If you are an international employee, for purposes of calculating benefit contributions and the coverage amount under the Plan, your annual pay is calculated as your annual base salary, prior bonus and prior year commissions. (Prior year commissions will be annualized if you were newly hired in the prior year.) The definition includes bonuses under the Management Bonus Plan, but does not include SPIFs (MVCI). Your annual pay amount does not change if the actual number of hours you work per week varies.

## COMPANY

Marriott International, Inc. and its subsidiaries and divisions electing to participate in the Plan.

EXHIBIT A

## DISABILITY OR DISABLED
You are disabled when Aetna determines that, due to your sickness or injury, you:

- Are limited from performing the material and substantial duties of your regular occupation; and
- Have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
- You must be under the regular care of a physician in order to be considered disabled.

After 24 months of payments, you are disabled when Aetna determines that, due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

## DISABILITY EARNINGS
The earnings that you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity.

## ELIMINATION PERIOD
If you are eligible for disability benefits, payments may begin after you have been disabled and unable to work for 182 days (30 days if you are an international employee). This 182-day period (or 30-day period if you are an international employee) is called the "elimination period." The elimination period begins on the first day you are unable to work because of a disabling condition. If you return to work for 30 or fewer days during the elimination period, but cannot continue to work because of your disability, the insurance company will count only those days you are disabled toward satisfying the elimination period. If you return to work for more than 30 days during the elimination period, but cannot continue to work because of your disability, you will have to begin a new elimination period.

## ERISA
The Employee Retirement Income Security Act of 1974 (ERISA), as amended, which outlines certain basic rights and protections for all employees.

## FAMILY AND MEDICAL LEAVE ACT (FMLA)
The Family and Medical Leave Act (FMLA), as amended, which requires employers with more than 50 employees to provide eligible workers with up to 12 weeks of unpaid leave each year for births, adoptions, foster care placements, and illnesses.

## GAINFUL OCCUPATION
An occupation that is or can be expected to provide you with an income, within 12 months of your return to work, that exceeds:

- 80% of your indexed monthly earnings, if you are working; or
- 60% of your indexed monthly earnings, if you are not working.

## GROSS DISABILITY PAYMENT
The benefit amount before Aetna subtracts deductible sources of income and disability earnings.

## HOSPITAL OR INSTITUTION
An accredited facility licensed to provide care and treatment for the condition causing your disability.

EXHIBIT A

### INDEXED MONTHLY EARNINGS
Your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index CPI-U is published by the U.S. Department of Labor. Aetna reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-U.

### INJURY
Bodily impairment resulting directly from an accident and independently of all other causes.

### INSURANCE COMPANY
Aetna Life Insurance Company, also referred to as Aetna.

### MATERIAL AND SUBSTANTIAL DUTIES
Duties that are normally required for the performance of your regular occupation and cannot be reasonably omitted or modified.

### MAXIMUM CAPACITY
Based on your restrictions and limitations:

- During the first 24 months of disability, the greatest extent of work you are able to do in your regular occupation, that is reasonably available.
- Beyond 24 months of disability, the greatest extent of work you are able to do in any occupation, that is reasonably available, and for which you are reasonably fitted by education, training, or experience.

### MAXIMUM PERIOD OF PAYMENT
The maximum amount of time the LTD benefit can be paid. It is based on your age when disability occurs.

### MENTAL ILLNESS
A psychiatric or psychological condition classified in the *Diagnostic and Statistical Manual of Mental Health Disorders (DSM)*, published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional, or behavioral disorders, or disorders related to stress. If the *DSM* is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.

### MONTHLY BENEFIT
The total benefit amount for which an employee is insured under the Plan, subject to the maximum benefit.

### MONTHLY PAYMENT
Your payment after any deductible sources of income have been subtracted from your gross disability payment. (See "Deductible Sources of Income" in the *LTD Plan Provisions* section.)

### PARTICIPANT
An eligible employee whose election to participate in the Plan has become effective, whose contributions are paid up to date, and whose participation has not been canceled for non-payment of contributions or any other reason.

### PARTICIPANT (INTERNATIONAL EMPLOYEES)
An associate who is covered under the International Medical Plan and is actively employed.

EXHIBIT A

**PHYSICIAN**

A person performing tasks that are within the limits of his or her medical license and:

- Who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
- With a doctoral degree in psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or
- Who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

Aetna will not recognize you or your spouse, children, parents, or siblings as a physician for a claim that you send to it.

**PLAN YEAR**

The calendar year (January 1 through December 31).

**PRE-EXISTING CONDITION**

A condition for which you received medical treatment, consultation, care, or services, including diagnostic measures, or took prescribed drugs or medicines, during the given period of time as stated in the Plan.

**REGULAR CARE**

You:

- Personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- Are receiving the most appropriate treatment and care that conform with generally accepted medical standards for your disabling condition(s), by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

**REGULAR OCCUPATION**

The occupation you are routinely performing when your disability begins. Aetna will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**SELF-REPORTED SYMPTOMS**

The manifestations of your condition, which you tell your physician, that are not verifiable using tests, procedures, or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to, headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness, and loss of energy.

**SICKNESS**

Illness, disease, pregnancy, or complications of pregnancy.

**WEEK-ENDING DATE**

The end of the payroll cycle, which is designated as the Friday of each week.

The Ritz-Carlton's week-ending date is the Thursday of each week.

"Week-ending date" does not apply to international employees.

EXHIBIT A

## IMPORTANT ADDRESSES AND PHONE NUMBERS

**INSURANCE COMPANY**
Aetna Life Insurance Company
P.O. Box 14560
Lexington, KY 40512-4560

Report a Claim
1-877-706-8776

Questions
1-877-706-8776

Fax
1-866-667-1987

**PLAN ADMINISTRATOR**
Marriott International, Inc.
Benefits Department 52-935.62
10400 Fernwood Road
Bethesda, MD 20817
1-301-380-4169

EXHIBIT A

---

# YOUR RIGHTS

## PLAN ADMINISTRATION

The following plans are sponsored by Marriott International, Inc., 10400 Fernwood Road, Bethesda, MD 20817:

- Empire BlueCross BlueShield PPO Plan
- Health Maintenance Organization (HMO) Plan
- Aetna Open Access Select (HMO) Plan
- Aetna Choice POS II Plan
- CIGNA Open Access Plus In-network (HMO) Plan
- CIGNA Open Access Plus PPO Plan
- Select Med HMO Plan
- Comprehensive Vision Plan
- Dental Care Plan
- Hourly Short-Term Disability (HSTD) Plan
- Salaried Short-Term Disability (SSTD) Plan
- Long-Term Disability Plan (Hourly Long-Term Disability [HLTD] and Salaried Long-Term Disability [SLTD])
- Group Term Life (GTL) Insurance Plan (Free Life and Additional Life)
- Accidental Death & Dismemberment (AD&D) Plan
- Business Travel Accident (BTA) Plan
- Health Care Spending Account (HCSA) Plan
- Dependent Care Spending Account (DCSA) Plan
- Severance Plan
- my Assistance & Resources for Life (myARL)
- Death Benefit Plan

The Plan Administrator, as a named fiduciary, has authority to control and manage the operation and administration of the Plan in accordance with the Plan document.

The plans listed above are welfare benefit plans intended to provide specified benefits to participating employees under the terms of the plans.

Marriott International, Inc. has designated Edward A. Ryan, Executive Vice President and General Counsel of Marriott International, Inc., as the agent for service of legal process. Mr. Ryan's address is Marriott International, Inc., 10400 Fernwood Road, Bethesda, MD 20817. The Plan Trustee, for all plans except for the Severance Plan and Business Travel Accident Plan, is Carolyn B. Handlon, Executive Vice President and Global Treasurer, Marriott International, Inc., 10400 Fernwood Road, Bethesda, MD 20817. Service of legal process may also be made upon the Plan Trustee (if the plan has a trust) or Plan Administrator.

The Benefits Department of Marriott International, Inc. acts as the Plan Administrator.

---

EXHIBIT A

The plans listed in this section are either self-funded or insured. Also, benefits are financed through contributions from either participants and/or the Company. Below is a chart illustrating, for each plan, whether the plan is self-funded or insured (and insured by whom), who contributes to the plan, and the plan's Identification Number:

| Plan | Self-Funded or Insured | Contributions | Plan ID Number |
|------|-----------------------|---------------|----------------|
| Empire BlueCross BlueShield PPO<br>Aetna Choice POS II<br>CIGNA Open Access Plus PPO | Self-funded | Company and employee | 501 |
| Aetna Open Access Select HMO<br>CIGNA Open Access Plus HMO<br>Select Med HMO | Self-funded | Company and employee | 501 |
| HMO Plan (excluding Aetna, CIGNA, and Select Med HMOs) | Funded through payments to the individual HMOs | Company and employee | 501 |
| Comprehensive Vision Plan | Insured by Combined Insurance Company of America | Employee only | 581 |
| Dental Care Plan | Self-funded | Company and employee | 521 |
| Dental Care Plan (New York) | Insured by Empire BlueCross BlueShield | Company and employee | 521 |
| Dental Care Plan (Hawaii) | Insured by Hawaii Dental Service (HDS) | Company and employee | 521 |
| Hourly Short-Term Disability (HSTD) Plan | Self-funded | Company and employee | 502 |
| Salaried Short-Term Disability (SSTD) Plan | Insured by Aetna Life Insurance Company | Employee only | 575 |
| Long-Term Disability Plan (Hourly Long-Term Disability [HLTD] and Salaried Long-Term Disability [SLTD]) | Insured by Aetna Life Insurance Company | Employee only | 503 |
| Group Term Life (GTL) Plan | Insured by Aetna Life Insurance Company | Trust reserves (Free Life)<br>Employee only (Additional Life) | 508 |
| Accidental Death & Dismemberment (AD&D) Plan | Insured by NUFIC | Employee only | 505 |

EXHIBIT A

| Plan | Self-Funded or Insured | Contributions | Plan ID Number |
|------|------------------------|---------------|----------------|
| Business Travel Accident (BTA) Plan | Insured by NUFIC | Company only | 580 |
| Health Care Spending Account (HCSA) Plan | Self-funded | Employee only | 551 |
| Dependent Care Spending Account (DCSA) Plan | Self-funded | Employee only | 541 |
| Severance Plan | Self-funded | Company only | 542 |
| my Assistance & Resources for Life (myARL) | Self-funded | Company only | 543 |
| Death Benefit Plan | Self-funded | Company only | 570 |

Participants contribute to the cost of the plans through payroll deductions. For plans that have a trust, participant contributions are held in trust by the Treasurer of Marriott International, Inc. The Company contributes from its general assets to the trust whatever funds are necessary, if any, to meet plan expenses in excess of the amount contributed by participants.

Any questions you may have or information you require concerning your benefits, rights, and privileges in the Plan can be obtained by contacting the Plan Administrator as follows:

Marriott International, Inc.
Benefits Department 52-935.62
10400 Fernwood Road
Bethesda, MD 20817
1-301-380-4169

Only the Plan Administrator or officially designated representatives are authorized to speak for the Plan.

Except as otherwise noted, all Plan records are kept on a plan year basis, which is the calendar year (January 1 through December 31). Plan records for the Severance Plan and the BTA Plan are kept on the same fiscal year as the Company, with the plan year ending on the Friday closest to December 31.

Marriott International, Inc.'s Employer Identification Number is 52-2055918.

Marriott International, Inc. reserves the right to discontinue any of the plans at any time. If a plan is discontinued, coverage for employees will cease at the end of the last pay period in which employee contributions were deducted, except as otherwise provided under the terms of the individual plan. Any assets that remain, including funds that participants have contributed, will be used to pay benefits for outstanding claims as directed by Marriott International, Inc. Payments will stop when those funds have been disbursed.

January 2010

EXHIBIT A

## RIGHTS OF PARTICIPANTS

As a participant in the Plan, you are entitled to rights and protection provided by the Employee Retirement Income Security Act of 1974 (ERISA). Under ERISA, all Plan participants are entitled to:

- Examine, without charge, at the Plan Administrator's office and upon 10 days notice at any location where 50 or more participants customarily work, all Plan documents, including insurance contracts and, if applicable, collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor;

- Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator, who may make a reasonable charge for the copies; and

- Receive a summary of the Plan's annual financial report, a copy of which by law must be furnished by the Plan Administrator to each participant.

In addition to creating rights for the Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate the Plan, called "named fiduciaries," have a duty to do so prudently and in the interest of all Plan participants and Beneficiaries.

No one, including your employer, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

If your claim for a benefit is denied or ignored, in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time periods.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of the Plan documents or the Plan's latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive them, unless they were not sent for reasons beyond the Plan Administrator's control. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court.

If the Plan's fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file a suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you sued to pay these costs and fees. If you lose, the court may order you to pay court costs and legal fees if it finds your claim is frivolous.

Upon written request, the Plan Administrator will furnish any Plan participant with information as to whether a particular subsidiary and/or division is included in the Plan and, if so, the subsidiary's and/or division's address.

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration (EBSA), U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration at 1-866-444-3272 or by logging on to the Internet at www.dol.gov/ebsa.

EXHIBIT A



10400 Fernwood Road
Bethesda, MD 20817
January 2010

Marriott® is a registered trademark of Marriott International, Inc.
myHR® is a registered trademark of Hewitt Management Company LLC.
Marrpay® is a registered trademark of Marriott International, Inc.

EXHIBIT A

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.
ATTORNEYS AT LAW
1000 29TH AVENUE NORTH
P.O. Box 357
MYRTLE BEACH, SOUTH CAROLINA 29578
TELEPHONE (843) 448-2400
TELECOPIER (843) 448-3022

*Writer's Direct Line:* 843-916-7167
*E-Mail: Bboroody@BellamyLaw.com*

HOWELL V. BELLAMY, JR.
JOHN K. RUTENBERG
JOHN E. COPELAND
CLAUDE M. EPPS, JR.
DAVID R. GRAVELY**
EDWARD B. BOWERS, JR.
BRADLEY D. KING
M. EDWIN HINDS, JR.
JILL F. GRIFFITH
DAVID B. MILLER****

*CERTIFIED SPECIALIST IN TAXATION LAW
**FELLOW OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS
***ALSO MEMBER OF NORTH CAROLINA BAR
****CERTIFIED MEDIATOR

C. WINFIELD JOHNSON, III
DOUGLAS M. ZAYICEK
JEFFREY W. KING***
MARTIN C. DAWSEY
ROBERT S. SHELTON****
HOWELL V. BELLAMY, III
ASHLEY P. MORRISON
GEORGE W. REDMAN, III
W. JOSEPH CUNNINGHAM**
BENJAMIN A. BAROODY***
PHILLIP H. ALBERGOTTI***

July 26, 2011

Ms. Dawn Labbe
Senior Disability Analyst
Aetna
Post Office Box 14560
Lexington, Kentucky 40512-4560

| | |
|---|---|
| Employee/Claimant: | STEVEN DEMORAES |
| Employer: | Marriott |
| Claim No.: | 4050421 |
| Group No.: | 0698443 |

Dear Ms. Labbe:

This law firm represents Steven Demoraes, the claimant referenced above. This letter will respond to your letter dated June 17, 2011, wherein you notified Mr. Demoraes that Aetna will not be approving his claim for benefits on the following ground:

The information provided does not provide any objective clinical findings of the level of impairment that you are suffering from as a result of the stroke. The doctor needs to clearly outline how any impairments found preclude you from performing the essential duties of your occupation as a Sales Representative which would include talking with clients and making sales presentations.

To be considered disabled under the terms of the subject policy, Mr. Demoraes must be: 1) "unable to perform the material and substantial duties of [his]... regular occupation;" and 2) "not working in any occupation." The fact that Mr. Demoraes is unable to perform his occupation as a timeshare salesman is evidenced by both his medical condition and his performance at work.

Mr. Demoraes was a timeshare salesman for Marriott Ocean Club in Myrtle Beach for six years before he became disabled. Mr. Demoraes was compensated by sales commissions only. Therefore, his performance is best measured by his earnings. In 2009, well into the recession, Mr. Demoraes earned $283,630.82 in sales commissions (Ex. 1), more than any other salesman.

EXHIBIT B

July 26, 2011
Page 2

In order to earn a commission, a timeshare salesman must first give sales presentations or "tours" to prospective customers. Good timeshare salesmen are able to use their training and sales techniques to sell timeshares to a high percentage of the prospective customers who he tours or to whom he gives presentations. In 2009, Mr. Demoraes averaged 42.25 tours each month, and 10.8 sales each month (Ex. 2).

On February 9, 2010, Mr. Demoraes underwent major back surgery. His application for short-term benefits under the same policy was granted for the period February 3, 2010 - May 1, 2010 (Claim No. 2557758).

On February 27, 2010, while recovering from surgery, Mr. Demoraes suffered a stroke. His symptoms consisted of severe headaches, neck pain, vertigo, dizziness, and difficulty focusing. Aetna granted Mr. Demoraes' request for an extension of short-term benefits.

On July 6, 2010, Mr. Demoraes attempted to return to work in spite of the persistence of these symptoms. However, these symptoms interfered with his ability to perform his job. His headaches and neck pain rendered him unable to endure long presentations. His dizziness, vertigo, and lack of concentration limited his ability to speak intelligibly about the timeshare product. He would repeat himself often, lose his train of thought, and became frustrated. His brain could no longer perform at the high level of function it had before the stroke. His prospective customers lost confidence in him. As a result, his earnings plummeted to approximately $60,000.00 for the period of April 1, 2010 - December 24, 2010 and $22,000.00 for the period January 1, 2011 - June 26, 2011 (Ex. 3). Mr. Demoraes averaged 19.5 tours each month and 2 sales each month during this period (Ex. 4).

Mr. Demoraes has consistently treated with Dr. Jeff Benjamin, a neurologist, since his stroke. I have enclosed each of those records, which reveal worsening debilitating symptoms and an unequivocal opinion that Mr. Demoraes is disabled. Dr. Benjamin informed a representative of Aetna of his opinions on June 1, 2011. He has further stated that he believes a neuropsychiatric test is neither necessary nor indicative of Mr. Demoraes' disability. His finding of disability is based upon his own objective tests performed upon Mr. Demoraes as are noted within the enclosed records and my summary thereof (Ex. 5).

Based upon the foregoing, I have difficulty understanding the basis for which Aetna has denied Mr. Demoraes' claim for short-term disability benefits. I further have difficulty understanding why Aetna ceased paying Mr. Demoraes short-term disability benefits when he returned to work July 6, 2010 when he continued to earn less than eighty percent (80%) of his weekly earnings after returning to work. I am therefore requesting you award short term disability benefits to Mr. Demoraes retroactive to May 9, 2011 and for the period July 6, 2010 - August 10, 2010, and further allow this letter to serve as notice of a claim for long-term benefits as well.

EXHIBIT B

July 26, 2011
Page 3

Should you have any questions or concerns regarding the above, please contact me.

With kindest regards, I am

Yours very truly,

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.

Benjamin A. Baroody

BAB:dg
Enclosures as noted
cc:    Client (w/o encl.)

EXHIBIT B

From: Featherstone, Debbi [mailto:FeatherstoneD@aetna.com]
Sent: Friday, February 17, 2012 2:52 PM
To: Baroody, Benjamin A
Subject: RE: Demoraes


02/17/2012


PO BOX 14560

Lexington, KY 40512-4560

DEBBI FEATHERSTONE

Senior LTD Claim Analyst

Fax: 866-667-1987




STEVEN DEMORAES

4891 LUSTERLEAF CIRCLE #302

MYRTLE BEACH SC - 29577




Group Control No:

0698443

Employer:

Marriott

Employee:

MR. STEVEN DEMORAES

Disability Claim Case No:

4658260


Dear STEVEN DEMORAES:

Marriott LTD group policy is underwritten by Aetna Life Insurance Company ("Aetna").

We have reviewed your claim for long term disability (LTD) benefits and have determined

2

EXHIBIT C

that, based on the information provided, and according to your policy, you are totally disabled from performing the duties of your own occupation. You are eligible to receive monthly benefits effective 11/2/2011, and continuing for up to 24 months as long as you remain totally disabled from your own occupation. Your policy defines total disability as:

"From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:

\* You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and
\* Your earnings are 80% or less of your adjusted predisability earnings.

After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition."

Criteria for Continuation of Benefits

Under your policy we may periodically re-evaluate your eligibility for benefits by requesting updated medical records from your treating providers. We will ask about your functionality, restrictions and limitations, the treatment plan and prognosis for returning to work. We may ask you to attend an evaluation by an independent physician or to attend a functional capacity evaluation. We may have your records reviewed by a peer physician consultant. Also, you may be contacted by a Vocational Rehabilitation Consultant who may ask you to participate in a vocational assessment interview and rehabilitation program. We encourage your cooperation as failure to do so may have an adverse effect on your benefits. If we determine that you are capable of performing the material duties of your own occupation, your monthly benefits will cease.

If you are still totally disabled from your own occupation and eligible for disability benefits on 11/02/2013, you must meet a more strict definition of disability as detailed in the above policy definition to remain eligible for benefits.

Under your policy, you may need to apply for Social Security Disability Income benefits which act as an offset or reduction to your LTD benefits. Failure to do so may have an adverse effect on your benefits.
In order to assist you in this process, you may be contacted by our Social Security Advocacy service Allsup Inc. This service is voluntary and is of no cost to you and we encourage you to participate when requested. If you are contacted by Allsup Inc, and have any questions, please contact us at the toll free number on this letter.

The contract that you are covered under states the following:

"The amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability started, calculated on a monthly basis.

Your predisability earnings will be figured from the rule below that applies to you.

1) If you are paid on an annual contract basis, your monthly salary is based on your annual contract divided by 12.

2) If you are paid on an hourly basis, the calculation of your monthly wages is based on your hourly pay rate multiplied by the number of hours you are regularly scheduled to work per month; but not more than 173 hours per month.

3

EXHIBIT C

3) If you do not have regular work hours, the calculation of your monthly salary or wages is based on the average number of hours you worked per month during the last 12 calendar months (or during your period of employment if fewer than 12 months); but not more than 173 hours per month.

Included in salary or wages are:

*       Commissions, Awards and bonuses averaged over the last 12 months of actual employment or such shorter period if actual employment was for fewer than 12 months.
*       Contributions you make through a salary reduction agreement with your Employer to any of the following:

*       An Internal Revenue Code (IRC) Section 125 plan for your fringe benefits.
*       An IRC 401(k), 403(b), or 457 deferred compensation arrangement.
*       An executive nonqualified deferred compensation agreement.

Salary or wages do not include:

*       Overtime pay.
*       Contributions made by your Employer to any deferred compensation arrangement or pension plan.

A retroactive change in your rate of earnings will not result in a retroactive change in coverage."

Based on the above contract language we requested the 12 months of payroll records prior to your last day of work on 5/3/2011 and calculated your monthly rate from those earnings.

Please read the enclosed "Notice Concerning Benefits" carefully. It explains how your LTD benefits relate to other income available to you.
Under your policy the total amount of income from all applicable sources, including your LTD payments, will not be less than 60% of your Monthly Rate of Basic Earnings(MRBE) of $ 6999.20, at the time your disability began. Your initial benefit is described below:

11/2/2011 - 11/2/2012

| | |
|---|---|
| Gross Benefit Amount | =$ 4059.54 |
|   Minus Offset(s) - STD | -1103.76 |
| Net Benefit Amount | =$ 2955.78 |

12/1/2011 - 7/31/2019

| | |
|---|---|
| Gross Benefit Amount | =$ 4199.52 |
|   Minus Offset(s) - | -0.00 |
| Net Benefit Amount | =$ 4199.52 |

8/1/2019 - 8/8/2019

4

EXHIBIT C

```
Gross Benefit Amount              =$ 1119.87
  Minus Offset(s) -                              -0.00
Net Benefit Amount                =$ 1119.87
```

Under the terms of your policy, your maximum period of benefit entitlement will end the day you turn age 65.

Please carefully read the instructions on the enclosed "Notice Concerning Benefits. Failure to comply with each applicable provision may jeopardize your future eligibility for LTD benefits.

Under the terms of your policy , there is a minimum monthly benefit equal to the greater of 10% of $4199.52 or $100.00.

Direct deposit service is a convenient way to automatically deposit your LTD benefit payment into your checking or savings account at your local banking institution.  An Electronics Fund Transfer (EFT) form is enclosed for your convenience. This service is offered to you at no charge. If you are interested in this service, please follow the instructions on the enclosed document.

Under separate cover, you will receive your initial payment for $15,554.34 minus any applicable taxes, representing LTD benefits due from 11/2/2011 through 2/29/2012.  All future LTD benefits will be paid at the end of each month.

Please be advised that we are informing you at this time that Marriott's Long-Term Disability Program has determined that an Independent Medical Examination (IME) will be necessary for further disability evaluation.
You will be contacted shortly with the details of this process by the IME vendor.

Once the IME date has been established, the IME vendor will communicate it to you by letter. If it is necessary for you to reschedule this, you must do so prior to the appointment date indicated in your letter. You may reschedule only once.

If you have additional clinical information that you wish to have the IME physician review, please send it to my attention so that we may forward it, or you may bring it with you to the IME appointment.

Please note: Failure to attend may result in suspension or denial of benefits.

Please bring a drivers license or other photo ID when you attend the examination.

At this time since we are awaiting the outcome of the IME which will enable us to determine your eligibility to receive disability benefits under the provisions of your group disability plan. As an act of good faith, effective 11/2/2011 we will temporarily issue benefits to you which are subject to the following conditions:

5

EXHIBIT C

1.    Our decision to issue these benefits:

a.        is not an admission of liability under the provisions of your disability plan; and

b.        does not represent a waiver of any plan provisions, limitations or defenses otherwise available to us

2.    We will continue to issue benefits until our evaluation of your eligibility to receive disability benefits is complete. At that time, we will immediately advise you of our decision. In the event that you are determined to be ineligible to receive these benefits, no further payments will be issued. However, you will not be required to reimburse the amount of benefits previously issued to you.

Exception: if you receive(s) "other income" as defined by the plan provision which reduces the net benefit, reimbursement of the equivalent amount of disability benefits received during concurrent periods of "other income" eligibility will be required.

If you have any questions, please feel free to contact us. If you are an Aetna medical member, please call 877-706-8776. If you are not an Aetna medical member, please call 877-238-6207.

Sincerely,

DEBBI FEATHERSTONE
Senior LTD Claim Analyst
Aetna Life Insurance Company

Enclosures:
Notice Concerning Benefits
Authorization for Direct Deposit of Disability Benefit Payment

CC: Ben Baroody

---

From: Featherstone, Debbi
Sent: Friday, February 17, 2012 2:49 PM
To: 'Baroody, Benjamin A'
Subject: RE: Demoraes

test

---

From: Baroody, Benjamin A [mailto:BBaroody@bellamylaw.com]
Sent: Friday, February 17, 2012 2:48 PM
To: Featherstone, Debbi
Subject: Demoraes

EXHIBIT C

<http://www.bellamylaw.com/>

Benjamin A. Baroody

Bellamy, Rutenberg, Copeland, Epps,

Gravely & Bowers, P.A.

1000 29th Avenue North          P.O. Box 357

Myrtle Beach, SC 29577          Myrtle Beach, SC 29578

General:    (843) 448-2400

Facsimile:  (843) 448-3022

www.BellamyLaw.com <http://www.bellamylaw.com/>

The information in this email is confidential and may be legally privileged.  It is
intended solely for the addressee.  Access to this email by anyone else is unauthorized.
If you are not the intended recipient, any disclosure, copy, distribution, or any action
taken or omitted to be taken in reliance on it is prohibited and may be unlawful.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements
imposed by the Treasury Department, we inform you that any U.S. federal tax advice
contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or
recommending to another party any transaction or matter addressed herein.

This e-mail may contain confidential or privileged information. If you think you have
received this e-mail in error, please advise the sender by reply e-mail and then delete
this e-mail immediately. Thank you.
Aetna

7
EXHIBIT C

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.
ATTORNEYS AT LAW
1000 29TH AVENUE NORTH
P.O. BOX 357
MYRTLE BEACH, SOUTH CAROLINA 29578
TELEPHONE (843) 448-2400
TELECOPIER (843) 448-3022

HOWELL V. BELLAMY, JR.
JOHN K. RUTENBERG
JOHN E. COPELAND
CLAUDE M. EPPS, JR.
DAVID R. GRAVELY*
EDWARD D. BOWERS, JR.
BRADLEY D. KING
M. EDWIN HINDS, JR.
JILL F. GRIFFITH
DAVID D. MILLER***

C. WINFIELD JOHNSON, III
DOUGLAS M. ZAYICEK
JEFFREY W. KING**
MARTIN C. DAWSEY
ROBERT S. SHELTON***
HOWELL V. BELLAMY, III
ASHLEY P. MORRISON
GEORGE W. REDMAN, III**
W. JOSEPH CUNNINGHAM**
BENJAMIN A. BAROODY**
PHILLIP H. ALBERGOTTI**

*FELLOW OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS
**ALSO MEMBER OF NORTH CAROLINA BAR
***CERTIFIED MEDIATOR

*Writer's Direct Line: 843-916-7167*
*E-Mail: Bbaroody@BellamyLaw.com*

March 15, 2012

VIA EMAIL - FeatherstoneD@aetna.com
VIA FACSIMILE - 866-667-1987
AND VIA U.S. MAIL
Ms. Debera Comar, Aetna Claims Manager
Ms. Karen Vanderventer, Aetna Disability Team Leader
c/o Ms. Debbie Featherstone
Aetna Life Insurance Company
Post Office Box 14560
Lexington, Kentucky 40512-4560

     Re:    Claim # 4658260
            Long-Term Disability

Dear Ms. Comar and Ms. Vanderventer:

    This letter follows my review of Ms. Featherstone's letter dated February 17, 2012 approving Mr. Demoraes' claim for long-term disability, yet calculating the benefit award based upon earnings of $69,453.55. The purpose of this letter is to appeal what appears to be a miscalculation of the benefits to be paid to Mr. Demoraes under the terms of his long-term disability insurance policy. The basis of this appeal is set forth below.

    Mr. Demoraes is a former employee of Marriott Vacation Club. Mr. Demoraes participated in Marriott's disability insurance plan managed and underwritten by Aetna. To that end, Mr. Demoraes authorized a weekly payroll deduction from each paycheck he received from Marriott for both short and long-term disability.

    To be considered disabled under the terms of the subject policy, Mr. Demoraes must be: 1) "unable to perform the material and substantial duties of [his]... regular occupation;" and 2) "not working in any occupation." The fact that Mr. Demoraes is unable to perform his occupation as a timeshare salesman is evidenced by both his medical condition and his performance at work.

EXHIBIT D

March 15, 2012
Page 2

Mr. Demoraes was a timeshare salesman for Marriott Ocean Club in Myrtle Beach for six years before he became disabled. Mr. Demoraes was compensated by sales commissions only. Therefore, his performance is best measured by his earnings. In 2009, well into the recession, Mr. Demoraes earned $283,630.82 in sales commissions, more than any other salesman.

In order to earn a commission, a timeshare salesman must first give sales presentations or "tours" to prospective customers. Good timeshare salesmen are able to use their training and sales techniques to sell timeshares to a high percentage of the prospective customers who he tours or to whom he gives presentations. In 2009, Mr. Demoraes averaged 42.25 tours each month, and 10.8 sales each month.

On February 9, 2010, Mr. Demoraes underwent major back surgery. Aetna granted his application for short-term benefits under the same policy for the period February 3, 2010 - May 1, 2010 (Claim No. 2557758). The benefit award was based upon an earnings calculation of $236,521.48, representing his earnings during the preceding twelve (12) month time period..

On February 27, 2010, while recovering from surgery, Mr. Demoraes suffered a stroke. His symptoms consisted of severe headaches, neck pain, vertigo, dizziness, and difficulty focusing. Aetna granted Mr. Demoraes' request for an extension of short-term benefits.

On July 6, 2010, Mr. Demoraes attempted to return to work in spite of the persistence of these symptoms. However, these symptoms interfered with his ability to perform his job. His headaches and neck pain rendered him unable to endure long presentations. His dizziness, vertigo, and lack of concentration limited his ability to speak intelligibly about the timeshare product. He would repeat himself often, lose his train of thought, and became frustrated. His brain could no longer perform at the high level of function it had before the stroke. His prospective customers lost confidence in him.

As a result, his earnings plummeted to approximately $60,000.00 for the period of April 1, 2010 - December 24, 2010 and $22,000.00 for the period January 1, 2011 - June 26, 2011. Mr. Demoraes averaged 19.5 tours each month and 2 sales each month during this period. These earnings were less than eighty percent (80%) of his previous weekly earnings.

However, in spite of his diminished performance, he continued to pay the same disability insurance premium previously paid by him in 2009. His October 2, 2010 Aetna Disability Insurance Statement confirms that, as of that time, any claim for long-term disability benefits would be based upon earnings of $236,521.48, 60% of which would generate $141,913.00 in total benefits. SEE EXHIBIT A.

When Mr. Demoraes left employment in June of 2011, he again applied for short-term disability benefits, but this claim was denied. The basis for the denial, as set forth in Ms. Labbe's June 17, 2011 letter, was as follows: "The information provided does not provide any objective clinical findings of the level of impairment that you are suffering from as a result of the stroke."

EXHIBIT D

March 15, 2012
Page 3

Mr. Demoraes thereafter retained our firm to assist him in obtaining both short and long-term disability benefits. By letter dated July 26, 2011, I notified Aetna of our representation and demand for both short-term and long-term benefits.

We provided Aetna with the opinion of Dr. Benjamin, Mr. Demoraes' treating physician, in which he opined that Mr. Demoraes was disabled. We went further to appease Aetna by requesting an independent, neuropsychological evaluation of Mr. Demoraes by Dr. Lynn Goldschmidt. Dr. Goldschmidt provided substantial objective test results to support a finding of disability under the terms of the policy contract. After a short battle, Mr. Demoraes' second claim for short term disability benefits was approved, and the approval was based upon earnings of $236,521.48- the twelve (12) months preceding his stroke (Claim No. 4050421).

Ms. Featherstone and I thereafter corresponded regarding Mr. Demoraes' pending claim for long-term disability benefits. While the Aetna automated system via your company's toll-free status hotline provided quite clearly that his claim had been approved, we spent in excess of three months dealing with the issue of peer review of your in-house physician's questions and concerns regarding Mr. Demoraes, a patient the physician had not even examined. While Dr. Benjamin responded immediately to your request for his comments upon the physician's report, it took some time for Dr. Goldschmidt to do the same. He did, and, within a matter of days thereafter, Aetna issued its present determination.

I understand you have now calculated Mr. Demoraes' earnings based upon the last twelve (12) months prior to his last day of work in July of 2011. This calculation is based upon earnings of a mere $69,453.55. Mr. Demoraes' claim for long-term disability benefits is no different than his second claim for short-term disability benefits. The basis for treating this claim differently than that claim- when the policy language governing the determination of eligibility and the calculation of the benefit is identical- is capricious and seemingly arbitrary.

In addition to the basic definition of disability as discussed above, Mr. Demoraes' policy contract also provides benefits when the cause of the disability- here a stroke- results in a loss of earnings greater than eighty percent (80%). Such is the case at hand. Mr. Demoraes did not become disabled in July of 2011; he became disabled as the result of his stroke, which occurred in February of 2010. This stroke caused Mr. Demoraes substantial impairment, which resulted in a substantial earnings loss.

While I understand there is no formal appeal process relative to the calculation of Mr. Demoraes' benefits, I ask that you reconsider your calculation in an effort to bring a just resolution to this claim. Mr. Demoraes is duly entitled to the benefits requested under his policy contract, and I have been provided with no legitimate basis for Aetna's denial thereof. The decision appears capricious and arbitrary especially in light of the fact that the same analysis applied to his second claim for short term benefits, and that claim was granted.

EXHIBIT D

March 15, 2012
Page 4

If Mr. Demoraes' current claim is not approved without reservation, I have been instructed to pursue legal action against Aetna for not only Breach of the terms of his insurance policy Contract, but also Bad Faith denial of those benefits. That claim will also include a claim for further short-term benefits retroactive to May 9, 2010 as previously requested in my initial demand letter. This letter will serve as notice that Mr. Demoraes has elected to accept the partial payments not in full satisfaction of his claim, but as a means of living day-to-day. Mr. Demoraes reserves all rights available to him to pursue an action against Aetna to collect those remaining benefits duly owed him.

Please respond to this letter within twenty (20) days of the date hereof.

With kindest regards, I am

Yours very truly,

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.

Benjamin A. Baroody

BAB:dg
Enclosures as noted
cc:     Client (w/encl.)

EXHIBIT D

# EXHIBIT A

 **Aetna™**

Aetna Life Insurance Company
Florida Disability Service Center
PO Box 14553
Lexington, KY 40512-4553

Richard Hall, FLMI, ALHC, AIAA, ACS
Senior Disability Risk Manager
Risk Management Unit

July 17, 2012

Steven Demoraes
C/O: Benjamin Baroody, Esq.

Re:                                      Long Term Disability
Employee:                          Steven Demoraes
Employer:                          Marriott
Group Control Number:      698443
WKAB Claim #:                  4658260

Dear Mr. Demoraes:

This letter is in reference to your claim for Long Term Disability (LTD) benefits under Group Policy #698443, issued to Marriott.  We have been providing you monthly disability benefits as a result of a claimed disability due to lumbar surgery of L3-L5, and then a subsequent stroke beginning May 3, 2011. At the time your disability commenced, you were employed in a Light physical demand level position as a Sales Representative, earning a monthly salary of $6,999.20 or $40.38 an hour.  After 24 months (November 2, 2012) of receiving LTD benefits, the definition of disability in your Policy becomes more stringent, and is based upon your inability to perform any reasonable occupation that would provide you with a gainful wage on a full time basis.

After careful review of this claim, in conjunction with the provisions of Marriott's LTD policy, we find that you were not eligible to receive LTD benefits since May 3, 2011.

In making our determination, our review included, but was not limited to, the following information:

- Outside Investigation reports and direct observation of your activities for the dates of June 24th and 25th of 2012.
- Medical records, Office Visit Notes, lab work/blood work, MRIs, CTs, and Attending Physician Statements from Dr. Jeff Benjamin, D.O. from February 10, 2010 to November 31, 2011.
- Attending Physician Statement and Office Visit Notes from Dr. Naishaj Shah, M.D. dated June 9, 2011.
- Neuropsychological testing conducted by Dr. Richard Berg, Ph.D., FACPN dated April 17, 2012.

EXHIBIT E

Steven Demoraes                    Page 2                    July 17, 2012

- Letter from Dr. Leonard Goldschmidt, J.D., Psy.D. dated February 13, 2012.
- Medical records from Dr. Terry Belden, M.D. from September 20, 2010 to April 14, 2011.
- On October 23, 2011 a Medical Peer Review was completed by Dr. Elana Mendelssohn, Psy.D. (Board Certified, American Board of Disability Analysts; Clinical Psychology and Neuropsychology).
- A Medical Peer Review was completed on June 15, 2012 by Dr. Vaughn Cohen (Board Certified, American Board of Psychiatry & Neurology; General Certification: Neurology)
- On June 19, 2012 a Medical Peer Review was conducted by Dr. Frederick Kadushin, Ph.D., ABN (Certified American Board of Neuropsychology).

Your Policy states, in pertinent part, the following:

*Test of Disability:*

*From the date that you first become disabled and until Monthly Benefits are payable for 24 months you meet the test of disability on any day that:*

*• you cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and*
*• your work earnings are 80% or less of your adjusted predisability earnings.*

*After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition.*

*When Long Term Disability Benefit Eligibility Ends:*
...
*You will no longer be considered as disabled nor eligible for long term monthly benefits when the first of the following occurs:*

*• The date you no longer meet the LTD test of disability, as determined by Aetna.*
*• The date you are no longer under the regular care of a physician.*
...
...
*• The date you fail to provide proof that you meet the LTD test of disability.*
*• The date an independent medical exam report or functional capacity evaluation fails to confirm your disability.*
...
...
...

EXHIBIT E

Steven Demoraes                    Page 3                    July 17, 2012

Overview:

A review of the file indicates that May 3, 2011 was your last date of employment with Marriott, and that you ceased working initially due to lumbar surgery of the L3-L5, and then subsequent stroke. Dr. Jeff Benjamin, D.O. is your current treating provider.

Outside Investigation:

As part of our routine claims evaluation, and to independently verify your capabilities and functionality with your claimed impairment and reported restrictions, direct observation of your activity was conducted on June 24th and 25th of 2012 and approximately 29 minutes of video were obtained. During this period you were observed and noted as exiting your residence and walking two dogs on leashes. At 12:03pm, you exited your residence, checked your cell phone, then walked on an exercise trail for approximately 1 hour and 20 minutes, and returned to your residence. A map reconnaissance indicated you walked approximately 4 miles. You completed your walk at 1:24pm and checked your cell phone prior to entering your residence. At 3:57pm you departed your residence and proceeded to a post office, where your entered carrying some mail. A few minutes later you exited and then drove to a medical office. You then drove to the Law Office of Bellamy Law, arriving at 4:30pm. Just after 6:00pm you were seen exiting the Law Firm carrying paperwork and talking on a cell phone. You then proceeded to drive to a grocery store, where you were observed pushing a cart, looking at various items, picking up items, including a gallon of milk, and then loading the grocery bags into your car. You then returned to your residence at about 6:40pm and carrying multiple grocery bags in your left hand up a flight of stairs to your apartment. You then returned to the car and carried the remaining bags up the stairs.

All of your observed and noted activities were all done without any restrictions or limitations and without any observable assistive devices, and without any outward signs of pain.

Medical:

On October 23, 2011 a Medical Peer Review was completed by Dr. Elana Mendelssohn, Psy.D. (Board Certified, American Board of Disability Analysts; Clinical Psychology and Neuropsychology). Dr. Mendelssohn reviewed the records and the neuropsychological testing that was conducted and concluded, *"In reviewing the claimant's job description, it is my opinion that there was no indication that his type of position was one requiring a high degree of cognitive abilities. It was noted in the job description that the job requirements were of a high school education/GED and maintaining a real estate license. Individuals who obtain high school diplomas and real estate licenses are abler to earn these degrees with average cognitive abilities."* She then concluded, *"Taken together,*

EXHIBIT E

Steven Demoraes                    Page 4                    July 17, 2012

*it is my opinion the information does not support the presence of a functional impairment that would interfere with the claimant's ability to perform his job duties from 5/3/11 through 12/31/11."*

A Medical Peer Review was completed on June 15, 2012 by Dr. Vaughn Cohen (Board Certified, American Board of Psychiatry & Neurology; General Certification: Neurology) and he attempted three times to speak with Dr. Benjamin and left three messages with no return call (6/7/12, 6/8/12, and 6/13/12). Dr. Cohen then reviewed your medical records and concluded that the medical aspects of this claim do not suggest a functional impairment from the claimant's own occupation or for any occupation from 7/1/10 to 12/31/12. He added, *"Although the claimant does have post operative neck pain and headache, nonetheless, the medical reports submitted do not reference these as significant considerations, and there is not evidence that neck pain and/or headache is of sufficient severity and/or intensity as to preclude work. With respect to balance issues and ataxia, it is noteworthy that the medical reports do not describe consistent evidence of significant ataxia or problems with gait and balance."* He went on to add that Dr. Benjamin's reports are inconsistent, and Dr. Beldon's reports make no mention of these issues as significant.

On June 19, 2012 a Medical Peer Review was conducted by Dr. Frederick Kadushin, Ph.D., ABN (Certified American Board of Neuropsychology). Dr. Kadushin reviewed your medical records and attempted an outreach to your attending physician, Dr. Goldschmidt on 6/11/12 and d 6/14/12. However, he did not receive a call back. He went on to state, *"Therefore based on the current documentation, while Dr. Benjamin appears to have noted what Mr. Demoraes reported to him, Dr. Benjamin never said that he observed any cognitive or functional difficulties. In fact, in each note, Dr. Benjamin described Mr. Demoraes mental status as revealing no evidence of cognitive defect."* He added, *"The most recent neuropsychological evaluation by Dr. Berg, on 4/17/12, revealed only one significant finding, which was an impairment of his abstract reasoning and problem solving, with his score falling at the 11th percentile. While his score in this range would suggest that Mr. Demoraes might have difficulties in situations that involve non-routine planning, organizing and decision making, no other significant deficit was observed. There was no information provided regarding the type of real estate practice that Mr. Demoraes had been involved in. However, generally speaking it is this reviewer's opinion that this type of impairment in abstract reasoning would not preclude him from performing the task generally necessary to be a real estate agent."*

<u>Summary:</u>

An independent observation of activity was conducted and you were found to be active walking over 4 miles, driving, walking dogs, standing, running errands to a Port Office, then a medical office, and then an attorney's office, walking while talking on a cell phone, grocery shopping, pushing a cart, loading your vehicle

EXHIBIT E

Steven Demoraes                     Page 5                          July 17, 2012

with groceries, carrying multiple bags of groceries up a flight of stairs two times; All without any restrictions or limitations and without any observable assistive devices, and without any outward signs of pain.

Three Medical Peer Reviews were conducted and all three concluded that you did not, and do not, have any restrictions and limitations that would from preventing you from being able to perform the duties of a Real Estate Sales Representative on a full-time basis.

As such we have determined that you retain the ability to perform your own occupation. Consequently, your claim for long term disability benefits is terminated effective May 3, 2011. However, we will not be requesting the return of disability benefits provided to you since that time.

We would like to inform you that further information regarding any other valid reasons for limiting or terminating your claim, which have not been previously considered, could come to our attention. Therefore, Aetna reserves the right to consider and assert other valid reasons for limiting or terminating your claim should they occur in the future.

In 2011 we encouraged you to work with our Social Security vendor, Allsup, to apply for Social Security Disability (SSD) benefits through the Social Security Administration (SSA.) We asked you to do this not only because your plan requires that you apply for other income benefits for which you may be eligible, but also because there are advantages to you if you are approved for SSD benefits. At that time we had medical and vocational information which indicated that you were totally disabled and it appeared that you would be eligible for SSD benefits either for a closed period or an indefinite period.

However, since that time, we have updated your LTD claim record as stated above, and we now have found that you are no longer eligible for LTD benefits under your policy, as you are no longer disabled based on the plan definition of Totally Disabled quoted above.

Appeal Rights:

In making our claim decision we do not waive any rights or defenses available to us under the contract.

Aetna Life Insurance Company will review any additional information you care to submit, such as medical information from all physicians who have treated you for the condition(s) in question, including but not limited to:

- a detailed narrative report for the period outlining in objective terms the specific physical limitations and restrictions inherent to your condition which your doctor has placed on you as far as gainful activity is concerned;

EXHIBIT E

Steven Demoraes                    Page 6                    July 17, 2012

- physician's prognosis including course of treatment, frequency of visits, and specific medications prescribed;
- copies of diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;
- any documents or information specific to the condition(s) for which you are claiming total disability, and which would assist in the evaluation of your disability status;
- Any other information or documentation you believe may assist in reviewing your claim.

You are entitled to a review of this decision if you do not agree. To obtain a review, you or your authorized representative should submit a written request to the address indicated below within 180 days following receipt of this letter. Your request should include your employer's name, your name, and claim number, other pertinent identifying information, comments, documents, records and other information you would like to have considered. You may also ask for copies of documents relevant to your request for review. Please mail or fax your request for review to:

Aetna Life Insurance Company
Attention:  WKAB Appeals
P.O. Box 14560,
Lexington, KY 40512-4560
855-733-1262

Once we receive your written request for a review, you will receive notification of the final determination within 45 days following Aetna's receipt of your request. This period may be extended up to an additional 45 days if special circumstances require such an extension, in which case you will be notified prior to the end of the first 45 day period that such an extension is required. If you do not appeal, your claim will be deemed abandoned and you will not be able reassert it.

If you do not agree with the final determination upon review, you have the right to bring a civil action under section 502(a) of ERISA.

Please feel free to contact me at 1-800-488-2386 should you have any questions.

Sincerely,

Richard Hall, FLMI, ALHC, AIAA, ACS
Sr. Disability Risk Manager
Aetna Disability Risk Management Unit
Aetna Life Insurance Company

EXHIBIT E

HOWELL V. BELLAMY, JR.
JOHN K. RUTENBERG (1930-2012)
JOHN E. COPELAND
CLAUDE M. EPPS, JR.****
DAVID R. GRAVELY*
EDWARD B. BOWERS, JR.*****
BRADLEY D. KING
M. EDWIN HINDS, JR.
JILL F. GRIFFITH
DAVID B. MILLER**

*FELLOW OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS
**ALSO MEMBER OF NORTH CAROLINA BAR
***CERTIFIED MEDIATOR
****RETIRED
*****LLM TAXATION
******MEMBER OF NC BAR ONLY

**BELLAMY, RUTENBERG, COPELAND,**
**EPPS, GRAVELY & BOWERS, P. A.**
ATTORNEYS AT LAW
1000 29TH AVENUE NORTH
P.O. Box 357
MYRTLE BEACH, SOUTH CAROLINA 29578
TELEPHONE (843) 448-2400
TELECOPIER (843) 440-0022

C. WINFIELD JOHNSON, III
DOUGLAS M. ZAYICEK
MARTIN C. DAWSEY*****
ROBERT S. SHELTON***
HOWELL V. BELLAMY, III
ASHLEY P. MORRISON
GEORGE W. REDMAN, III*
BENJAMIN A. BARGODY**
PHILLIP H. ALDERDGE†††**, *****
HAYES K. STANTON*
JAMES E. HILL, III**, *****
KIERSTEN M. GORDON******

*Writer's Direct Line: 843-916-7167*
*E-Mail: hbarondy@BellamyLaw.com*

December 28, 2012

**VIA FEDERAL EXPRESS**
Aetna Life Insurance Company
ATTENTION: WKAB APPEALS
Post Office Box 14560
Lexington, Kentucky 40512-4560

| | |
|---|---|
| Re: | Long Term Disability |
| Employee: | Steven DeMoraes |
| Employer: | Marriott Vacation Club |
| Group Control No.: | 698443 |
| WKAB Claim No.: | 4868280 |

Dear Claims Administrator:

Our firm represents Steven DeMoraes. This letter will serve as his Notice of Appeal of Aetna's termination of his long-term disability benefits and analysis dated July 17, 2012.

### NATURE OF REPRESENTATION/ PROCEDURAL POSTURE

As you are aware, by letter dated July 26, 2011, I notified Aetna that our firm had been retained by Mr. DeMoraes to 1) appeal Aetna's July 14, 2011 denial of Mr. DeMoraes' application for short-term disability benefits and 2) file a claim for long-term benefits.

In September of 2011, Aetna approved Mr. DeMoraes' claim for short-term benefits. His award was based upon a calculation of sixty-percent (60%) of his 2009 annual earnings of $236,521.48 ($283,630.82, less bonuses).

By letter dated February 17, 2012, Aetna approved Mr. DeMoraes' claim for long-term benefits. However, his award was substantially less, as it was based upon a calculation of sixty-percent (60%) of his July 2010- May 2011 earnings of $69,453.55.

**EXHIBIT F**

December 27, 2012
Page 2

By letter dated March 14, 2012, I appealed Aetna's calculation of long-term benefits.

During the pendency of that appeal, I received a letter from Aetna dated July 17, 2012 informing Mr. DeMoraes that Aetna was terminating his long term disability benefits. This letter will serve as an appeal of that determination.

## SUMMARY OF CASE

Steven DeMoraes suffered a stroke in February of 2010, causing him significant damage to his cognitive functioning. He immediately applied for and was awarded short-term disability benefits. He later attempted in good faith to return to work against the recommendation of his treating neurologist. His attempt to return to work was unsuccessful as the exposure to the stress of work only worsened his symptoms. He then re-applied for short term disability benefits and was ultimately approved. He then applied for long-term benefits and was approved, though the calculation of those benefits was at issue. Aetna soon thereafter terminated his benefits.

Mr. DeMoraes became disabled immediately following his stroke in February of 2010. His symptoms - intractable headaches, neck pain, memory loss, confusion, inability to focus, and the like- were present then and are present today. The exposure to the stress and pressure of work as a timeshare salesman increases those symptoms, rendering him unable to work.

Mr. DeMoraes' treating neurologist, Jeff Benjamin, has opined he was and remains disabled. Lynn Goldschmidt, M.D., who performed an independent neuropsychological examination of Mr. DeMoraes' cognitive functioning, has opined he was and remains disabled. Mr. DeMoraes has applied for and been approved for Social Security Disability Benefits.

Mr. DeMoraes has and continues to fit the definition of disabled under the Aetna policy. If and when approved, he should be awarded benefits based upon a calculation of sixty-percent (60%) of his total compensation (salary and bonus) earned in calendar year 2009, *prior to his disability*, which totaled $283,630.82.

## BACKGROUND FACTS

Mr. DeMoraes is a former employee of Marriott Vacation Club. Mr. DeMoraes participated in Marriott's disability insurance plan managed and underwritten by Aetna. To that end, Mr. DeMoraes authorized a weekly payroll deduction from each paycheck he received from Marriott for both short and long-term disability. To be considered disabled under the terms of the subject policy, Mr. DeMoraes must be:

1)    **"limited from performing the material and substantial duties of [his]... regular occupation;"**

2)    have a 20% or more loss in [his] indexed monthly earnings due to the same

EXHIBIT F

December 27, 2012
Page 3

sickness or injury; and

3)    are under the regular care of a physician." (January 2010 Aetna LTD Policy).

The fact that Mr. DeMoraes is unable to perform his occupation as a timeshare salesman is evidenced by his performance at work following his stroke, the opinions of Drs. Benjamin and Goldschmidt, the opinions of two former co-workers, the determination by the Social Security Administration, and, most importantly, the two prior determinations by Aetna.

Mr. DeMoraes was a sales executive for Marriott Ocean Club in Myrtle Beach for six years before he became disabled. Mr. DeMoraes was compensated by sales commissions only. Therefore, his performance is best measured by his earnings. In 2009, well into the recession, Mr. DeMoraes earned $283,630.82 in sales commissions, more than any other salesman.

In order to earn a commission, a timeshare salesman must first give sales presentations or "tours" to prospective customers. Good timeshare salesmen are able to use their training and sales techniques to sell timeshares to a high percentage of the prospective customers who he tours or to whom he gives presentations. In 2009, Mr. DeMoraes averaged 42.25 tours each month, and 10.8 sales each month.

On February 9, 2010, Mr. DeMoraes underwent major back surgery. Aetna granted his application for short-term benefits under the same policy for the period February 3, 2010 - May 1, 2010 (Claim No. 2557758).  The benefit award was based upon an earnings calculation of $236,521.48, representing his earnings during the preceding twelve (12) month time period..

On February 27, 2010, while recovering from surgery, Mr. DeMoraes suffered a stroke. His symptoms consisted of severe headaches, neck pain, vertigo, dizziness, and difficulty focusing. Aetna granted Mr. DeMoraes' request for an extension of short-term benefits.

On July 6, 2010, Mr. DeMoraes attempted to return to work in spite of the persistence of these symptoms. However, these symptoms interfered with his ability to perform his job. His headaches and neck pain rendered him unable to endure long presentations. His dizziness, vertigo, and lack of concentration limited his ability to speak intelligibly about the timeshare product. He would repeat himself often, lose his train of thought, and became frustrated. His brain could no longer perform at the high level of function it had before the stroke.

As a result, his earnings plummeted to approximately $60,000.00 for the period of April 1, 2010 - December 24, 2010 and $22,000.00 for the period January 1, 2011 - June 26, 2011. Mr. DeMoraes averaged 19.5 tours each month and 2 sales each month during this period. These earnings were less than eighty percent (80%) of his previous weekly earnings.

However, in spite of his diminished performance, he continued to pay the same disability insurance premium previously paid by him in 2009. His October 2, 2010 Aetna Disability Insurance

EXHIBIT F

December 27, 2012
Page 4

Statement confirms that, as of that time, any claim for long-term disability benefits would be based upon earnings of $236,521.48, 60% of which would generate $141,913.00 in total benefits. However, please note that this calculation is also incorrect since his policy actually provides that, for long-term disability benefits, he is entitled to sixty-percent (60%) of his pre-disability earnings, which includes both salary *and bonuses*. The $236,521.48 figure *excludes 2009 bonuses*.

When Mr. DeMoraes left employment in June of 2011, he again applied for short-term disability benefits, but this claim was denied. The basis for the denial, as set forth in Ms. Labbe's June 17, 2011 letter, was as follows: "**The information provided does not provide any objective clinical findings of the level of impairment that you are suffering from as a result of the stroke.**"

Mr. DeMoraes thereafter retained our firm to assist him in obtaining both short and long-term disability benefits. By letter dated July 26, 2011, I notified Aetna of our representation and demand for both short-term and long-term benefits.

We provided Aetna with the opinion of Dr. Benjamin, Mr. DeMoraes' treating physician, in which he opined that Mr. DeMoraes was disabled. We went further to appease Aetna by requesting an independent, neuropsychological evaluation of Mr. DeMoraes by Dr. Lynn Goldschmidt. Dr. Goldschmidt provided substantial objective test results to support a finding of disability under the terms of the policy contract. After a short battle, Mr. DeMoraes' second claim for short term disability benefits was approved, and the approval was based upon earnings of $236,521.48- the twelve (12) months preceding his stroke, less bonuses (Claim No. 4050421).

Ms. Featherstone and I thereafter corresponded regarding Mr. DeMoraes' pending claim for long-term disability benefits. While the Aetna automated system via your company's toll-free status hotline provided quite clearly that his claim had been approved, we spent in excess of three months dealing with the issue of peer review of your in-house physician's questions and concerns regarding Mr. DeMoraes, a patient the physician had not even examined.

While Dr. Benjamin responded immediately to your request for his comments upon the physician's report, it took Dr. Goldschmidt additional time to do the same. Within only a few days of him doing so, however, Aetna issued its determination finding that Mr. DeMoraes fit the definition of disability, but calculating his benefits based upon post-disability earnings and not pre-disability earnings[1].

By letter dated March 14, 2012, I notified Aetna that Mr. DeMoraes was appealing the calculation of his long-term benefits. This appeal was based upon the following:

---

[1] Ms. Featherstone explained that Aetna calculated Mr. DeMoraes' earnings based upon the last twelve (12) months prior to his last day of work in July of 2011. This calculation is based upon earnings of a mere $69,453.55.

EXHIBIT F

December 27, 2012
Page 5

1)     Mr. DeMoraes' claim for long-term disability benefits was no different than his second claim for short-term disability benefits. The basis for treating the calculation of his long-term claim differently than that claim- when the policy language governing the determination of eligibility and the calculation of the benefit is nearly identical[2]- is capricious and arbitrary. The record appeared to show that Aetna was seemingly fishing for *any reason* to deny Mr. DeMoraes' claim.

2)     DeMoraes did not become disabled in July of 2011; he became disabled as the result of his stroke, which occurred in February of 2010. This stroke caused Mr. DeMoraes substantial impairment, which resulted in a substantial earnings loss.

3)     Aetna should have included both compensation *and bonus payments* earned by Mr. DeMoraes during the twelve months prior to this stroke to determine his pre-disability earnings. This amount would have been at or around the $283,630.82 earned by Mr. DeMoraes in 2009, and not the $236,521.48 figure used to calculate his short-term benefits, which excluded his bonuses.

By letter dated July 17, 2012, Aetna terminated Mr. DeMoraes' long-term disability benefits. The basis for this determination is abhorrent, as such consists of irrelevant surveillance information, peer reviews and opinions of physicians who had neither examined Mr. DeMoraes nor read all of his medical records, and no regard whatsoever for facts presented by Mr. DeMoraes in his Affidavit or the medical opinions of those physicians who had actually examined him.

ARGUMENT

If the claims examiner reviewing this appeal upholds Mr. Hall's determination, he will have given creedence to the age-old and widely-held assumption that insurance companies merely look for a way to deny claims and nothing more.

What follows is a dispute of Mr. Hall's findings:

Fist, Mr. Hall misstated the overview and facts of this case. Mr. DeMoraes underwent back surgery in February of 2010. He applied for and received short term disability benefits from Aetna at that time. On February 20, 2010, while recovering from surgery, Mr. DeMoraes suffered a debilitating stroke[3]. As a result of the stroke, Mr. DeMoraes applied for and received an extension of short term disability benefits. In July of 2010, Mr. DeMoraes attempted to return to work against the advice of his treating neurologist, Dr. Benjamin.[4] After enduring months of

---

[2] For short-term claims, Aetna defines pre-disability earnings to exclude bonuses, whereas for long-term claims, the pre-disability earnings includes bonuses as well. Thus, the long-term award should be higher than that awarded under the short-term policy.

[3] See DeMoraes Affidavit and Opinion Letter of Dr. Benjamin

[4] See DeMoraes Affidavit and Opinion Letter of Dr. Benjamin.

EXHIBIT F

December 27, 2012
Page 6

extreme discomfort, headaches, memory loss, and the like, and after obtaining various accommodations from Marriott, and upon the advice of his neurologist, Mr. DeMoraes stopped working again. At no point during this period of time did Mr. DeMoraes' disability fail to exist, nor did his condition improve. This fact is established in Mr. DeMoraes' Affidavit testimony, the testimony of his two former co-workers, and the medical records and testimony of his treating physician Dr. Benjamin. Again, Mr. DeMoraes' return to work was a good faith attempt to continue doing what he loved, *in spite of medical advice to the contrary*. His job performance thereafter compared to his pre-stroke performance is the true testament that his disability rendered him unable to perform.

Second, Mr. Hall misstates the calculation of benefits to which Mr. DeMoraes is entitled if and when he is approved. At the time Mr. DeMoraes applied for long-term disability benefits in 2011, he was paying monthly insurance premiums based upon his 2009 annual earnings-$283,000.00. Mr. DeMoraes was a highly successful, high-income earner who paid a monthly disabilty premium expecting sixty-percent (60%) of his earnings prior to the occurrence of an unexpected catastrophe of some sort that would render him unable to continue earning as such. That catastrophe occurred in February of 2010 when he suffered a stroke.

Mr. DeMoraes understood that he was paying those premiums and was insured for that amount because if he had not been disabled for six months of 2010 he would have made approximately the same as he did in 2009. So as stated in his insurance declaration page, he was being insured for 141,000 and was paying $27.84 a week premium for long term disability.

Third, Mr. DeMoraes did apply for and was approved for short term disability benefits from Aetna that ran from May 2011 until Oct 2011. He was paid based on pre-disability earnings from January 2009 - January 2010, receiving receiving $2700 each week. Aetna required Mr. DeMoraes to undergo testing to demonstrate the deficiencies brought upon by the stroke and he underwent many hours of testing administered by Dr Goldschmidt. These tests were taken eighteen months after the stroke occurred, and they demonstrated significant impairment. Upon receiving these results in September of 2011, Aetna immediately approved his claim.

Fourth, Mr. Hall's denial relies upon irrelevant information and makes an arbitrary conclusion. Most notably, Mr. Hall cites a private investigation of Mr. DeMoraes that details him walking his dogs and walking outside alone. Prior to the stroke, Mr. DeMoraes exercised five to seven days each week, consisting of jogging, use of an elyptical machine, and weight lifting. As the result of his stroke, Mr. DeMoraes cannot engage in these activities and is relegated to slow, long walks. Any type of activity too strenuous increases Mr. DeMoraes' heart rate and causes him to become dizzy and suffer tremendous headaches. Similarly, Mr. DeMoraes does grocery shop, but even simple grocery shopping causes him to become dizzy, which is not nor cannot be reflected in the surveillance report.

Fifth, Dr. Elena Mendelson's determination that Mr. DeMoraes' position did not involve a high degree of cognitive functioning is erroneous and not based upon any evidence whatsoever.

EXHIBIT F

December 27, 2012
Page 7

Dr Mendleson has no personal knowledge or evidence from other employees of Marriott Vacation Club of the day-to-day functions performed by Mr. DeMoraes, which are detailed in his Affidavit, the Affidavits from two former employees, and the notes of Dr. Goldschmidt. Contrary to her baseless observations, his job required a tremendous degree of cognitive skill.

As detailed by Mr. DeMoraes and his two former co-workers, the position of Sale Executive for Marriott Vacation Club involves a tremendous amount of cognitive skill. Marriott is very selective in its hiring of sales executives, about twenty-five sales executives are hired every year, and on average only three of those twenty-five make it to the next year. This high attrition rate is due to the difficulty of the job. Mr. DeMoraes has always made the designation of Super Saphire Club and consistently generated sales that sometimes more than doubled that of the other sales execs at Marriott. In 2009 his sales were in excess of $2.4 million, whereas an average sales executive generated approximately $900,000.00 in annual sales. Mr. DeMoraes was one of the few Presidential Sales Executives in the entire Marriott sales system, which is worldwide.

Sixth, Dr. Vaughn Cohen failed to consider the effect of headaches and neck pain upon Mr. DeMoraes' cognitive skills in functioning at work. Dr. Cohen correctly notes that Mr. DeMoraes suffered headaches and neck pain. He incorrectly concludes, however, that these symptoms have no effect upon his ability to function at work. This conclusion is likely the result of his failure to see Mr. DeMoraes. If he had, he would understand that the nature of Mr. DeMoraes' condition is such that his symptoms increase and worsen with exposure to stress. This key point is mentioned by both Dr. Goldschmidt and Dr. Benjamin.

As discussed in the Affidavits of Mr. DeMoraes, Nita Nichols, and Claire Hammock, the position of Sales Executive requires strong personality, quick thinking, problem solving, listening, remembering, and among many other things, speaking in a persuasive and fluent pattern to best generate trust and a sense of commonality with the client. It is clearly noted by Mr DeMoraes and by Dr Benjamin that he no longer had these capabilities. His speech was slowed, the right words were hard to come by, forgetfulness occurred, questions were repeated by Mr DeMoraes, key elements of the product were omitted from presentations. Overall, Mr DeMoraes no longer possessed the proper brain power and communication prowess to do the job that he had done in the past. Dr Cohen chose to omit all of those elements of the case in order to come up with the conclusion that he did.

Seventh, Dr. Kadushin's peer review, while correctly noting Mr. DeMoraes' poor functioning in significant tests, wrongfully assumed that Mr. DeMoraes is a real estate agent. Dr. Kadushin references Dr Berg's neuropsychological examination of Mr. DeMoraes on April 17, 2012. He notes that Mr DeMoraes scored in the 11th percentile on a test which measured his abstract reasoning and problem solving skills. Dr Kadushin goes on to note that this would mean that Mr DeMoraes would have difficulty in situations that involve non-routine planning, organizing, and decision making, all of which should not prevent him form performing his job *as a real estate agent.*

EXHIBIT F

December 27, 2012
Page 8

Mr. DeMoraes is not a real estate agent. He is a timeshare sales executive. The two job descriptions and functions are highly different from one another, as is detailed in Mr. DeMoraes' Affidavit. Mr DeMoraes' job consisted of presenting the product to clients and was effectively given 90 minutes to talk someone into spending $15,000 to $40,000 when they had come into the tour expecting to buy nothing. This is dramatically different than "real estate sales."

Dr. Goldschmidt has submitted a detailed report disputing point by point each and every finding made in Mr. Hall's report. As noted by Dr Goldschmidt in his original report, Aetna should try to save money on someone else.

## CONCLUSION

In sum, I urge the claims administrator to reinstate Mr. DeMoraes' long-term disability benefits and to adjust the calculation to reflect pre-disability earnings of the twelve months preceding his February 2010 stroke.

With kindest regards, I am

Yours very truly,

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.

Benjamin A. Baroody

## VERIFICATION

I, Steven DeMoraes, being duly sworn, hereby swear and affirm that the foregoing statements of fact and opinion are my own, and I hereby attest to their truth and accuracy.

Steven DeMoraes

SWORN to be me this 28th
day of _Dec ber_ 2012

_____ (L.S.)
Notary Public for South Carolina
My Commission Expires: 2/26/20

## EXHIBIT F

# aetna™

PO Box 14578
Lexington, KY 40512 4578
Susan Dorman
Sr. Appeal Specialist
Phone: 1-866-326-1380
Fax: 1-855-733-1262

04/19/2013

Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, PA
Attention: Benjamin Baroody
PO Box 357
Myrtle Beach, SC 29578

APR 2 4 2013

| | |
|---|---|
| Group Control No: | 0698443 |
| Employer: | Marriott |
| Employee: | Steven DeMornes |
| Disability Claim Case No: | 4658260 |

## ** MAINTAIN A COPY OF THIS LETTER FOR YOUR RECORDS **

Dear Mr. Baroody:

The Marriott Long Term Disability (LTD) group policy is underwritten by Aetna Life Insurance Company (Aetna).

We have completed our review of your appeal, submitted on behalf of your client, Steven DeMornes, of the termination of his LTD benefits. These benefits were terminated for the reason noted below.

There was a lack of medical evidence to support your client's inability to perform the material duties of his own occupation.

Based upon our review of all of the information submitted and gathered during the claim and appeal, we have overturned our original decision to terminate your client's benefits.  As a result, his claim has been returned to the claims operation team and will be re-opened by his Disability Benefits Manager (DBM) for review and benefit payment, effective July 18, 2012.  Any benefits owed will be processed separately.

We have notified your client's employer of this determination.

Should you, or your client, have questions regarding this claim or this decision, please do not hesitate to contact our office at 1 866 326 1380.

Sincerely,

Susan Dorman
Sr. Appeal Specialist
Aetna Life Insurance Company

**EXHIBIT G**

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.
ATTORNEYS AT LAW
1000 29TH AVENUE NORTH
P.O. Box 357
MYRTLE BEACH, SOUTH CAROLINA 29578
TELEPHONE (843) 448-2400
TELECOPIER (843) 448-8022

HOWELL V. BELLAMY, JR.
JOHN K. RUTENBERG (1930-2012)
JOHN E. COPELAND
CLAUDE M. EPPS, JR.****
DAVID R. GRAVELY*
EDWARD B. BOWERS, JR.*****
BRADLEY D. KING
M. EDWIN HINDS, JR.
JILL F. GRIFFITH
DAVID B. MILLER***

*FELLOW OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS
**ALSO MEMBER OF NORTH CAROLINA BAR
***CERTIFIED MEDIATOR
****RETIRED
*****LLM TAXATION
******MEMBER OF NC BAR ONLY

C. WINFIELD JOHNSON, III
DOUGLAS M. ZAYICEK
MARTIN C. DAWSEY*****
ROBERT S. SHELTON***
HOWELL V. BELLAMY, III
ASHLEY P. MORRISON
GEORGE W. REDMAN, III**
BENJAMIN A. BAROODY**
PHILLIP H. ALBEROOTTI** *****
HAYES K. STANTON**
JAMES E. HILL, III** *****
KIERSTEN M. GORDON******

*Writer's Direct Line:* 843-916-7167
E-Mail: Bbaroody@BellamyLaw.com

Via U.S. Mail
Via Facsimile - 860-975-0390
VIA EMAIL ONLY - hallr@aetna.com

May 3, 2013

Mr. Richard Hall
Aetna Life Insurance Company
Post Office Box 14560
Lexington, Kentucky 40512-4560

Re:    Group Control No.:   0698443
       Employer:            Marriott
       Employee:            Steven Demoraes
       Disability Claim No.: 4658260

Dear Mr. Hall:

Thank you for discussing the above-referenced claim with me yesterday afternoon. Pursuant to our conversation, I understand that you have issued a check to Mr. Demoraes via direct deposit for benefit payments for the period of July 2012 until April 2013. I understand the payment was approximately $42,000.00, less approximately $24,000.00 in Social Security Disability Income payments.

Based upon those calculations, it was apparent that the benefit payments represented 60% of pre-disability earnings of an amount far less than the $283,630.82 he earned in the twelve (12) months prior to his stroke in February of 2010. I requested that you issue me a letter setting forth the basis of this calculation, and you agreed to provide the same to me.

Please provide me with your letter setting for the basis for your calculation as soon as possible as Ms. Dorman's letter overturning the denial did not. Thank you.

With kindest regards, I am

Yours very truly,

BELLAMY, RUTENBERG, COPELAND,
EPPS, GRAVELY & BOWERS, P.A.

Benjamin A. Baroody

BAB/dg
cc:    Client

**EXHIBIT H**

'3/2013 3:36 PM                    AETNA -> 18414403022                    Page 2 of 3
Aetna - TaskLetterView                                                    Page 1 of 2



PO BOX 14560
Lexington, KY 40512-4560
PETER SMITH
CLAIM TEAM LEADER
Fax: 866-667-1987

Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A.
Attn: Benjamin A. Baroody
1000 29th Ave. North
Myrtle Beach, South Carolina 29578

Group Control No:        0698443
Employer:                Marriott
Employee:                MR. STEVEN DEMORAES
Disability Claim Case No:  4658260

Dear Mr. Baroody:

The Marriott group policy (Policy) is underwritten by Aetna Life Insurance Company (Aetna).

We are writing to you regarding your client's LTD benefits provided by your client's employer, Marriott, under the above referenced plan. The following responses are relating to your letter dated May 13th, 2013.

In regard to the contention that earnings should be from 2009, the employee did return to work for a period of work greater than 10 months from July of 2010 until May of 2011. Clinical reviews of the medical data during that time period confirmed our assessment that the claimant was capable of working during that time frame. There was a reduction in earnings during this period of time, however this was not related to any disability as the claimant was released to work, and did work full time.

The Earnings Definition states that the earnings are based on "The amount of salary or wages you were receiving from an employer participating in the plan on the day before a period of disability started, calculated on a monthly basis".

It is our contention that based on the full time return to work period any reduction in earnings were unrelated to disability and that those earnings are to be used as they were in effect on the day prior to when the new period of disability began in 2011. The Disability in 2011 does not become part of the prior disability as the employee returned to active employment for a period greater than six months.

Regarding the contention that Short Term Disability (STD) usage of the $236,000.00 figure for earnings equates to an agreement that the LTD disability should relate back to February of 2010, we do not agree with that contention.

The STD processing was utilizing an earnings figure fed to the claim via an automated process and it is our contention that this figure is incorrect to be used for the impairment beginning in May 2011. In the LTD processing the payroll information was reviewed for the 12 months prior to disability. The actual salary calculated for that period was the figure of $69,453.55. This amount is based on actual payroll as opposed to a system fed amount from the employer.

In terms of the calculation of earnings, you indicate in your letter that we should calculate as you have in the appeal. It appears that method refers to using the figure which is 60% of his salary that was earned in the twelve months preceding his stroke. Based on our responses above it is our assertion that the date of disability

EXHIBIT 1

for the current LTD claim is May of 2011.
In addition, based on questions about the true amount of salary earned by the employee, we obtained actual payroll records to calculate based on base salary plus any commissions and bonuses within the 12 months preceding disability.

In the case of having payroll records from the employer vs. a systems fed figure that was based on previous earnings, we opt to use the actual payroll for the 12 months preceding our date of disability. We are still following the definition of disability and feel confident this is a more accurate depiction of earnings for the twelve months preceding disability.

If you have any questions, please call 877-238-6207.

Sincerely,


PETER SMITH
CLAIM TEAM LEADER
Aetna Life Insurance Company

As of August 1, 2013

| | Aetna Payment | Aetna Paid | | SSD Offest to recover[4] |
|---|---|---|---|---|
| 11/1/2011 | 11,781.54 [1] | | 2,955.78 [2] | 2,400.00 |
| 12/1/2011 | 11,781.54 | | 4,199.52 | 2,400.00 |
| 1/1/2012 | 11,781.54 | | 4,199.52 | 2,400.00 |
| 2/1/2012 | 11,781.54 | 15,554.34 [2] | 4,199.52 | 2,400.00 |
| 3/1/2012 | 11,781.54 | 4,199.52 | | 2,400.00 |
| 4/1/2012 | 11,781.54 | 4,199.52 | | 2,400.00 |
| 5/1/2012 | 11,781.54 | 4,199.52 | | 2,400.00 |
| 6/1/2012 | 11,781.54 | 4,199.52 | | 2,400.00 |
| 7/1/2012 | 11,781.54 | | 1,799.52 [3] | |
| 8/1/2012 | 11,781.54 | | 1,799.52 | |
| 9/1/2012 | 11,781.54 | | 1,799.52 | |
| 10/1/2012 | 11,781.54 | | 1,799.52 | |
| 11/1/2012 | 11,781.54 | | 1,799.52 | |
| 12/1/2012 | 11,781.54 | | 1,799.52 | |
| 1/1/2013 | 11,781.54 | | 1,799.52 | |
| 2/1/2013 | 11,781.54 | | 1,799.52 | |
| 3/1/2013 | 11,781.54 | | 1,799.52 | |
| 4/1/2013 | 11,781.54 | | 1,799.52 | |
| 5/1/2013 | 11,781.54 | 17,995.20 [3] | 1,799.52 | |
| 6/1/2013 | 11,781.54 | 1,799.52 | | |
| 7/1/2013 | 11,781.54 | | | -1,799.52 [5] |
| 8/1/2013 | 11,781.54 | | | |
| | | | | |
| Subtotals | 259,193.88 | 52,147.14 | | 17,400.48 |

**Total Aetna Owes deMoraes    189,646.26**

---

[1] Monthly benefits calculated at 60% of pre-disability earnings of $283,630.82
x .60 = $170,178.49 or $14,181.54/month less $2,400.00 in SSDI offest.

[2] Lump sum payment includes payments for November 2011, December 2011, January 2012, and February 2012.

[3] Lump sum payment includes payments for July 2012 through May 2013.

[4] Monthly Social Security Disability offset.

[5] Monthly Social Security Disability recovered by Aetna+A8.

EXHIBIT J

STATE OF SOUTH CAROLINA )   IN THE COURT OF COMMON PLEAS
)   FIFTEENTH JUDICIAL CIRCUIT
COUNTY OF HORRY )   CIVIL ACTION NO. 2013-CP-26-05277

Steven deMoraes )
)
              Plaintiff, )
)
v. )    **ACCEPTANCE OF SERVICE**
)        **ON BEHALF OF**
Marriott International, Inc., Aetna Life )  **AETNA LIFE INSURANCE COMPANY**
Insurance Company, and Marriott )
International, Inc. Benefit Plan, )
)
            Defendants. )
)

      The undersigned attorney for the Defendant, Aetna Life Insurance Company, in the above-entitled action hereby accepts and acknowledges the due personal service of the Summons and Amended Complaint upon the undersigned at her office in Greenville County, South Carolina, and the receipt of a true copy is hereby acknowledged.


                            _Jennifer E. Johnsen_
                            Jennifer E. Johnsen
                            Attorney for Defendant,
                            Aetna Life Insurance Company

Greenville, South Carolina

Date: _9/3/13_